[S. F. No. 17242. In Bank. Nov. 8, 1945.]

PAYROLL GUARANTEE ASSOCIATION, INC. (a Corporation) et al., Petitioners, v. THE BOARD OF EDUCATION OF THE SAN FRANCISCO UNIFIED SCHOOL DISTRICT et al., Respondents.

Wayne M. Collins, J. Lamar Butler and Lawrence W. Allen for Petitioners.

Clarence E. Rust, John H. Brill and James J. Cronin, Jr., as Amici Curiae on behalf of Petitioners.

John H. O'Toole, City Attorney, Walter A. Dold, Chief Deputy City Attorney and Irving G. Breyer for Respondents.

S. V. O. Prichard, Assistant County Counsel of Los Angeles County, as Amicus Curiae on behalf of Respondents.

TRAYNOR, J.—By this proceeding in mandamus petitioners seek to compel respondents to grant their application for the use of the auditorium of the Evening High School of Commerce at San Francisco on Friday evening, November 9, 1945.

Sections 19431-19433 of the Education Code (as partly amended in 1945) provide as follows:

"19431. There is a civic center at each and every public school building and grounds within the State where the citizens, parent-teachers' association, Campfire Girls, Boy Scout troops, farmers' organizations, clubs, and associations formed for recreational, educational, political, economic, artistic, or moral activities of the public school districts may engage in supervised recreational activities, and where they may meet and discuss, from time to time, as they may desire, any subjects and questions which in their judgment appertain to the educational, political, economic, artistic, and moral interests of the citizens of the communities in which they reside. Governing boards of the school districts may authorize the use, by such citizens and organizations of any other properties under their control, for supervised recreational activities.

"19432. Any use, by any individual, society, group, or organization which has as its object or as one of its objects, or is affiliated with any group, society, or organization which has as its object or one of its objects the overthrow or the advocacy of the overthrow of the present form of government of the United States or of the State by force, violence, or other unlawful means shall not be granted, permitted, or suffered.

"Any person who is affiliated with any organization, which advocates or has for its object or one of its objects the overthrow of the present government of the United States or any State, Territory, or Possession thereof, by force or violence or other unlawful means, or any organization of persons which advocates or has for its object or one of its objects the overthrow of the present government of the United States or any State, Territory, or Possession thereof, by force or violence or other unlawful means, is hereby declared to be and is characterized, a subversive element.

"Notwithstanding any of the other terms of this chapter, no such governing board shall grant the use of any school

property to any person or organization who or which is a subversive element as herein defined.

"For the purpose of determination by such governing board whether or not such person or such organization of persons applying for the use of such school property, is a subversive element as herein defined, such governing board may require the making and delivery to such governing board, by such person or any members of such organization, of affidavits in form prescribed by such governing board, stating facts showing whether or not such person or organization is a subversive element as herein defined. . . .

"19433. The use of any public schoolhouse and grounds for any meeting is subject to such reasonable rules and regulations as the governing board of the district prescribes and shall in nowise interfere with the use and occupancy of the public schoolhouse and grounds, as is required for the purposes of the public schools of the State."

■ Thus the statute, in making school buildings available as centers for community activities, establishes the condition that such activities must not disturb the educational program that constitutes the main and continuing purpose of the public schools. The respondent board may not only make reasonable regulations with regard to the use of the school auditorium for authorized purposes but may deny an application for its use if (1) such use would further, directly or indirectly, the overthrow of the present government of the United States or any State, Territory or Possession thereof, by force or violence or other unlawful means, or (2) would interfere with the use and occupancy of the public schoolhouse and grounds as required for the purposes of the public schools of the State. (See *Goodman* v. *Board of Education*, 48 Cal.App.2d 731 [120 P.2d 665].)

■ Petitioners have applied for the use of the auditorium for a mass meeting open to the public without charge, to acquaint the public with a proposed state constitutional amendment that petitioners intend to place on the ballot at the next general election to be known as "California Full Employment and Pension System." They intend to present Gerald L. K. Smith as speaker. Petitioners' application was filed on the prescribed form and bears the required signature of the school principal, certifying that the proposed use would not conflict with school programs or other scheduled meetings. The board has filed in this pro-

ceeding an affidavit of the principal ''that the approval was limited to the availability of the auditorium for the evening applied for by said organization. That susbsequent to the approval of said request, affiant has been informed that Mr. Gerald L. K. Smith will be a speaker on the program scheduled for such use; that affiant has been informed that in each and every instance where Gerald L. K. Smith has spoken in a public building in the State of California, there have been extended picket lines at such building, resulting in a noisy and boisterous demonstration; that affiant is informed and believes, and on the basis of such information and belief alleges that if this application is granted, there will be extended picket lines comprising several thousand persons who will surround the building, causing noisy and boisterous demonstrations . . . that affiant is informed and believes, and on the basis of such information and belief, alleges that if this application is granted, numerous pupils enrolled at said school will refuse to go through the picket lines in order to attend classes; that the demonstrations, with attendant noises caused by such an extended picket line, will interfere with the use and occupancy of the said school and will interfere with the regular conduct of school work.'' The board has also filed an affidavit of the Superintendent of Schools ''that the demonstrations with attendant noises caused by such an extended picket line will interfere with the use and occupancy of the school building and will interfere with the regular conduct of the school work.'' Representatives of various organizations appeared before the board, and other organizations sent in written statements, protesting the use of the auditorium and announcing their intention to picket the meeting. The minutes of the board show ''that the general reasons advanced for the opposition . . . was that Gerald L. K. Smith is an undesirable character, whose activities and speeches are attempting to divide the American people on the question of race and religion. That his activities are in no way different than those advocated by. leaders of the Fascist Government which has existed in Europe, and that because of this fact public property should not be used to assist his activities.'' It was also urged by the opponents that the proposed meeting would interfere with school activities. The board members were advised by the board's attorney that the application must be granted

unless the proposed meeting would interfere with the regular school work.

Respondent board has emphasized in this proceeding that its refusal of petitioners' application rests exclusively on the ground that in its opinion the proposed meeting would interfere with the school activities scheduled at that time. It is conceded that on the night of the proposed meeting there will be evening classes at the same school, although no classes are scheduled on Saturdays and Sundays. Moreover, it appears that there are auditoriums available in other schools where no classes are scheduled on the night of petitioners' proposed meeting. The board has determined that, although the auditorium will not be required for the scheduled classes, the proposed meeting would greatly interfere with the conduct of the classes because the proposed speaker would arouse, as he has in Los Angeles and other cities, so much organized opposition that classes would be disturbed if not disrupted. The board had substantial evidence before it to support its determination that such an outcome was likely. Hence this court cannot declare that it was the board's ministerial duty to grant petitioners' application.

Petitioners do not deny that the board is justified in believing that the proposed meeting would be picketed, and that interference with the school work might ensue. They contend, however, that such interference would not be of their own doing and therefore cannot justify the board's action in denying them the use of the auditorium on a school night. They invoke section 19501 of the Education Code, which provides: ''Any person who wilfully disturbs any public school . . . meeting is guilty of a misdemeanor. . . .'' They contend that it would be for the police to prevent any disturbance of the proposed meeting or of the school work, and that petitioners should not be penalized for any possible inability of the police department to prevent such disturbances.

Section 19501, however, is concerned only with wilful disturbance of public school meetings. It does not inhibit the expression of opposition to political meetings held in school auditoriums. It could not do so without infringing upon the constitutional right of free speech, which can be exercised by peaceful picketing. Speakers who express their opinions freely must run the risk of attracting opposition;

they cannot expect their opponents to be silenced while they continue to speak freely. If a speaker in a school building or the opposition that he aroused attracted so much attention as to disturb school activities, it would not be for the police to curb those who incidentally caused the disturbance so long as their activities were lawful, but for the board to prevent the occurrence of such a disturbance. Neither a speaker nor his opponents are thereby stilled; they may express themselves fully and freely in school buildings as elsewhere whenever their activities do not bring in their wake a disturbance of the regular school program. (See *Cox* v. *New Hampshire,* 312 U.S. 569, 574 [61 S.Ct. 762, 85 L.Ed. 1049, 133 A.L.R. 1396].)

The board's primary concern is with the maintenance of that program. It cannot dissipate its energies by seeking to guide and control or even to evaluate the strategy of opposing factions at every passing meeting that may be held in a school building. The activities of two opposed groups might operate in conjunction to interfere with school work. A speaker has a large part in fixing the character of his meeting; he cannot disclaim some share of the responsibility for whatever reactions his speech provokes. Again the disturbance might result, not from any activity of either the speaker or his opposition, but merely from an overflow audience. It is for the board to determine, not who would motivate a disturbance, but how serious is the risk of disturbance. The primary task of the schools is education. The statute establishes that the educational activities of schools shall at all times take precedence over other permissive but secondary uses of school buildings. In passing on an application for an extraneous use of a school auditorium the board must consider the probable effect of the proposed use on the regular school program and must deny one that would lead to an interference with that program.  When the board denied petitioners' use of the auditorium in a school on a night when regular classes were scheduled it acted well within the authority conferred upon it by section 19433 of the Education Code providing that any meeting shall "in nowise interfere with the use and occupancy of the public schoolhouse and grounds, as is required for the purposes of the public schools of the State."

The alternative writ is discharged and the application for the peremptory writ of mandate is denied.

Gibson, C. J., Shenk, J., Edmonds, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The issue presented in this case is whether or not the governing body of a school district may arbitrarily refuse the use of a school building under its supervision for a public assembly. I agree with the premise of the majority opinion that the primary function and purpose of school buildings is education and training of students, and that the governing board should not permit the use of the buildings for any purpose which is inimical to that function. A pivotal issue in this case is, therefore, whether there was such a showing made before the board to justify its conclusion that that function would be impaired if petitioner was granted permission to use the building. It must be conceded that the board cannot act arbitrarily or capriciously. But before discussing that question there are certain vital factors to be considered.

First, it is conceded by the majority opinion that there is no issue of the element of subversiveness in this case. The board did not purport to base its denial of permission on that ground. Hence, we must assume that we have an organization which itself is, and the causes it espouses are, wholly lawful in every respect. Second, the state law unequivocally places school buildings in the same category, as far as public assemblies are concerned, as public parks and streets. Section 19431 of the Education Code reads:

*"There is a civic center at each and every public school building and grounds* within the State where the citizens, parent-teachers' association, Campfire Girls, Boy Scout troops, farmers' organizations, clubs and *associations formed for recreational, educational, political, economic,* artistic, or moral activities of the public school districts *may engage* in supervised recreational activities, and *where they may meet and discuss, from time to time, as they may desire, any subjects and questions which in their judgment appertain to the educational, political, economic, artistic, and moral interests of the citizens of the communities in which they reside.* Governing boards of the school districts may authorize the use, by such citizens and organizations of any other properties under their control, for supervised recreational activities." (Emphasis added.) (See, also, *Goodman* v. *Board of Education,* 48 Cal.App.2d 731 [120 P.2d 665].) It is obvious from the

statute and the Goodman case that a public policy has been clearly and unequivocally declared by the Legislature. *That policy is that school buildings shall be available for public assemblies and for the exercise of those cherished rights, freedom of speech and assembly.* Those concomitant rights are guaranteed by the First and Fourteenth Amendments to the Constitution of the United States and the Constitution of California. (Cal. Const., art. I, §§ 9 and 10.) *Hence, it must follow that the Legislature of California by its foregoing declaration of policy has provided a place where those constitutional rights may be exercised.* For those reasons I have stated that the school building is in the same category as public streets and parks. The Supreme Court of the United States has forcefully declared the right to exercise those rights in the latter places. The use of such places is inseparably interwoven with the rights themselves. In *Hague* v. *Committee for Industrial Organization,* 307 U.S. 496, 515 [59 S.Ct. 954, 83 L.Ed. 1423], the court said:

"Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, *time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.* The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied." (Emphasis added.) In the instant case the declaration by the Legislature, rather than ancient custom, as in the case of parks and streets, makes school buildings the place for the exercise of the rights involved.

This brings us to the only limitation (pertinent to this case) on the use of the school buildings for the exercise of those rights—the only basis upon which the board may refuse permission, namely, the use must not, in the language of the statute, in anywise "interfere with the use and occupancy of the public schoolhouse and grounds, as is required for the purposes of the public schools of the State." (Education Code, § 19433.) And "No use shall be inconsistent with the use of

the buildings or grounds for school purposes, or interfere with the regular conduct of school work." (Education Code, § 19402.) It is true the board has discretion in determining whether such interference will occur but it cannot exercise that discretion arbitrarily or capriciously or upon speculation or for reasons which will substantially impair the declared policy that school buildings may be used for the exercise of free speech and assembly. As said in *Goodman* v. *Board of Education, supra,* page 734:

"It appears from the above (referring to the use of schools for public assemblies but making school use paramount) that *some* discretionary, but *not arbitrary,* power is reposed in the board. . . ." (Italics added.)

In this case there are two factors which, it is asserted, justified the board's conclusion that there would be an interference with the school functions: (1) The psychological factor, that is, that there is a threat that the place will be picketed and the adult pupils will not attend the evening classes. (2) The disturbance factor; that there is a threat that there will be such noise and commotion that classes cannot be conducted. In this connection it must be remembered that it is undisputed that the room in the building, the use of which petitioner seeks, is available, no school functions being scheduled therein. In regard to both of those elements it should be observed that they are nothing more than speculation and conjecture which certainly do not constitute a proper basis for the board's action. All we have is the mere opinion that those things are going to happen. That is not sufficient as a basis for refusing permission. The United States Supreme Court said in *Hague* v. *Committee for Industrial Organization, supra,* 516, in speaking of the refusal to permit assemblies in parks and streets:

"It (the ordinance dealing with permits) does not make comfort or convenience in the use of streets or parks the standard of official action. It enables the Director of Safety to refuse a permit *on his mere opinion that such refusal will prevent 'riots, disturbances or disorderly assemblage.'* It can thus, as the record discloses, be made the instrument of arbitrary suppression of free expression of views on national affairs, *for the prohibition of all speaking will undoubtedly 'prevent' such eventualities. But uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the*

*right.''* And in *Cox* v. *New Hampshire,* 312 U.S. 569, 577 [61 S.Ct. 762, 85 L.Ed. 1049, 133 A.L.R. 1396]:

"In *Hague* v. *Committee for Industrial Organization, supra,* the ordinance dealt with the exercise of the right of assembly for the purpose of communicating views; it did not make comfort or convenience in the use of streets the standard of official action but enabled the local official absolutely to refuse a permit on his mere opinion that such refusal would prevent 'riots, disturbances or disorderly assemblage.' The ordinance thus created, as the record disclosed, an instrument of arbitrary suppression of opinions on public questions. The court said that 'uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right.' ''
Likewise, in the instant case the refusal based upon mere opinion is arbitrary and that is all the board had upon which to base its action. Also, similarly the assumption by the board and the majority opinion that there will be noise and boisterous conduct, must be based upon the untenable premise that all law enforcement facilities and the school authorities will be wholly impotent or will refuse to maintain order and protect the pupils in attending classes, an assumption of nothing less than anarchy. To that proposition the complete answer is made in *Hague* v. *Committee for Industrial Organization, supra,* 516, the "uncontrolled official suppression . . . cannot be made a substitute for the duty to maintain order. . . .''
Both of the factors touching interference with school functions are predicated on what some third persons may or may not do. The board in refusing permission *is not exercising its judgment.* It is bowing to the threats or conjectured conduct of third persons. In the one case it is picketing and in the other the possible refusal of the pupils to attend classes. If it is permitted to base its action on such grounds there is nothing left of the cherished rights of freedom of speech and assembly and of the declared right to use school buildings for that purpose. If the Republican Party desires the use of a school building to hold a meeting the board may refuse permission upon the assumption or threat by the parents of students of Democratic persuasion that they will not attend classes. If any meeting of any character by any group is proposed and it is opposed by only one person or many persons attending the school a denial of permission might follow. That amounts, not to a fair exercise of discretion by

the board on the issue of interference with school functions, but to a dictatorship by one person or many, completely negativing the constitutional guaranties and the right to use school buildings to express them. The question of interference with school functions cannot thus be made to turn on the whim and caprice of the mental attitude of the pupils toward the proposed meeting. In such event *it is not the proposed assemply* which *interferes with the school program, it is the pupils who are interfering because of their refusal to attend classes,* but the board in denying the permit is penalizing the group desiring to assemble rather than the pupils. The same reasoning applies where there is a threat or assumption of noise, commotion, rioting or violence which will disturb the classes. And in addition there is the factor that such condition, if it arises, should be and presumably will be controlled by the proper authorities. Suppose someone threatened to burn the school buildings if the meeting were held. Would anyone. say that such a threat was such an interference as to authorize a denial of permission? Even if there is reason to believe that there will be noise which will disturb classes, the school officials are competent to cope with that situation. They may maintain order and prevent any undue commotion or disturbance.

The reasoning upon which the majority opinion is based makes it possible for any school board to deny the use of school buildings to anyone who may apply when the proposed use is for a purpose which may be even slightly controversial, as it will not be difficult to find those who will object and threaten. This is all that is required to deny permission for such use under the rule of the majority opinion. This places in the hands of school boards, especially in those communities where there is only one school building available for such uses, the power to deny permission for the use of such building to anyone whom a majority of the board dislike. Discrimination and favoritism are bound to result, and the obvious purpose and object which the Legislature had in mind in enacting the so-called Civic Center Act will be frustrated.

The history of civilization is replete with instances in which those in power have sought to suppress expression of the thoughts and ideas of those advocating philosophies with which they did not agree. Human nature has not changed, and notwithstanding constitutional and statutory provisions and court decisions declaring the rights of freedom of speech and assembly to constitute the very foundation of our demo-

cratic way of life, there are still those who because of ignorance, prejudice, self-interest or blind bigotry would deny these rights to those who advocate a philosophy out of harmony with their own views. To the end that the basic concept of our civil liberties may be preserved with fairness and equality to all, the courts should be alert to strike down any attempted infringement of these fundamental rights regardless of the guise under which it is cloaked.

Petitioner's application for a rehearing was denied November 29, 1945. Carter, J., voted for a rehearing.