[S. F. No. 17249. In Bank. Nov. 27, 1945.]

JOHN B. ELLIS et al., Petitioners, v. THE BOARD OF EDUCATION OF THE SAN FRANCISCO UNIFIED SCHOOL DISTRICT et al., Respondents.

Wayne M. Collins, J. Lamar Butler and Lawrence W. Allen for Petitioners.

A. L. Wirin as Amicus Curiae on behalf of Petitioners.

John J. O'Toole, City Attorney, Walter A. Dold, Chief Deputy City Attorney, and Irving G. Breyer for Respondents.

TRAYNOR, J.—By this proceeding in mandamus petitioners seek to compel respondents to permit them to use the auditorium of the Evening High School of Commerce at San Francisco· for a meeting open to the public without charge on Sunday afternoon, December 2, 1945, free of any requirement that they furnish public liability insurance.

In an earlier proceeding petitioners sought a writ of mandate to compel respondent board to grant them the use of the auditorium on an evening when regular classes were scheduled in the school building. This court denied their petition, holding that the board acted within its authority under Education Code section 19433 in rejecting petitioners' application on the ground that the proposed meeting would interfere with scheduled school activities. (*Payroll Guarantee Association* v. *Board of Education, ante,* p. 197 [163 P.2d 433].) Petitioners then requested permission to use the auditorium for the same purpose and with the same speaker on a Sunday afternoon, when there will be no school activities. Respondent board has granted their application on condition that petitioners furnish a public liability insurance policy in the name of the San Francisco Unified School District in the sum of $100,000 for each injured person and $400,000 for each accident. In the earlier proceeding, petitioners declared that they would meet that condition under protest. They now contend that such a condition would prevent them from holding the meeting, and have submitted affidavits to show that although they have applied to many insurance companies, none has been willing to issue them a policy.

On September 28, 1943, respondent board adopted the following resolution: "Resolved: That whenever the use of school property is granted to an outside organization under the provisions of Section 19431 of the California Education Code, no charge shall be made for heating, lighting, janitorial or other services, except as set forth under the provisions of section 19438 of the California Education Code,[1] and the cost of such services as noted shall be provided for out of school

---

[1] This section authorizes a charge for the use of schoolhouses, property, and grounds for meetings at which admission fees are charged.

district funds. Further resolved: That when an auditorium or gymnasium is requested, a public liability insurance policy shall be furnished in the name of the San Francisco Unified School District in the sum of $100,000/$400,000, except that the requirement for said policy may be waived for organizations, clubs or associations organized for general character building, welfare purposes, or in connection with the national war effort. Further resolved: That all rules and regulations of this Board in conflict with the above are hereby repealed."

Respondent board contends that this regulation is authorized by sections 2204, 19401, 19433, 19434, and 19435 of the Education Code, quoted in the margin.[2] Petitioners contend that the regulation is invalid on the grounds that it violates the basic purpose of the Civic Center Act (Ed. Code, §§ 19431-19439) and conflicts with sections 19437 and 19439 of the Education Code, quoted in the margin.[1] Petitioners have made their application under the Civic Center Act. That act is controlling, and regulations or terms and conditions made by the board in conflict therewith are invalid.

---

[2] "2204. The governing board of any school district shall: (a) Prescribe and enforce rules not inconsistent with the law or with the rules prescribed by the State Board of Education, for its own government, and for the government of the schools under its jurisdiction."

"19401. The governing board of any school district may grant the use of school buildings or grounds for public, literary, scientific, recreational, or educational meetings, or for the discussion of matters of general or public interest upon such terms and conditions as the board deems proper, and subject to the limitations, requirements, and restrictions set forth in this chapter."

"19433. The use of any public school house and grounds for any meeting is subject to such reasonable rules and regulations as the governing board of the district prescribes and shall in nowise interfere with the use and occupancy of the public schoolhouse and grounds, as is required for the purposes of the public schools of the state."

"19434. The management, direction, and control of the civic center is vested in the governing board of the school district."

"19435. The governing board of the school district shall make all needful rules and regulations for conducting the civic meetings and for such recreational activities as are provided for in this chapter and which aid, assist, and lend encouragement to the activities."

[1] "19437. The use of schoolhouses, property, and grounds pursuant to this chapter shall be granted free."

"19439. Lighting, heating, janitor service, and the services of the person when needed, and other necessary expenses, in connection with the use of public school buildings and grounds pursuant to this chapter, shall be provided for out of the county or special school funds of the respective school districts in the same manner and by the same authority as similar services are provided for."

(*First Industrial Loan Co.* v. *Daugherty,* 26 Cal.2d 545, 550 [159 P.2d 921]; *Whitcomb Hotel Inc.* v. *California Emp. Com.,* 24 Cal.2d 753, 757 [151 P.2d 233, 155 A.L.R. 405]; *Boone* v. *Kingsbury,* 206 Cal. 148, 161 [273 P. 797].)

Respondents have stated that the district is generally not insured against public liability with respect to its school buildings and grounds, but that they deem such insurance necessary, with certain exceptions, when schools are used for the purposes specified in the Civic Center Act. We are here concerned, not with the board's authority to insure the district against such liability (see Ed. Code, § 1029) or with the exercise of its discretion in determining whether such insurance is necessary, but only with the question whether the board can require others to pay the costs of such insurance.

Any inquiry into the validity of the regulation must consider the nature of the insurance protection that respondent board requires petitioners to furnish. Respondent board states that claims might be made against it for injuries resulting from an alleged defective condition of the school building and its equipment or of the school grounds, or from alleged inadequate exits in case of fire or other emergency, or from an alleged failure to appoint custodians to maintain order in connection with the meeting. By way of illustration it has filed a policy recently furnished by another association in connection with an application for the use of the Galileo High School Auditorium. That policy names as the insured the "San Francisco Unified School District and/or Individual Members of San Francisco Board of Education while acting within the scope of their duties as such" and also the association. The board's regulation, however, requires only that the policy be furnished in the name of the school district. The coverage is defined as follows: "Coverage A—Bodily Injury Liability—To pay on behalf of the Insured all sums which the Insured shall become obligated to pay by reason of the liability imposed upon him by law for damages, including damages for care and loss of services, because of bodily injury, including death at any time resulting therefrom, sustained by any person or persons, caused by accident and arising out of the hazards hereinafter defined. Coverage B—Property Damage Liability—To pay on behalf of the Insured all sums which the Insured shall become obligated to pay by reason of the liability imposed upon him by law for damages because of injury to or destruction of property,

including the loss of use thereof, caused by accident and arising out of the hazards hereinafter defined.'' The hazards are defined as follows: ''Division 1. Premises—Operations —The ownership, maintenance or use, for the purposes stated in the declarations, of the premises, and all operations during the policy period which are necessary or incidental to such purposes. Division 2. Elevators—The ownership, maintenance, or use, for the purposes stated in the declarations, of any elevator therein designated.'' The company also agreed to ''defend in his name and behalf any suit against the Insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent.''

The policy required would not insure the school district against injury to the school building or other property of the district, or against liability for injuries resulting from conduct of those attending or protesting the meeting for which respondents would not be responsible. It would insure the district only against liability for injuries to others arising out of the hazards incident to the school district's ownership and management of the building, schoolgrounds, and equipment. Such hazards would arise from the failure of the district to maintain the premises and equipment in a reasonably safe condition or to fulfill its duties in managing the property. In effect respondents demand insurance protection against their liability to others in the event they fail to fulfill their own duties as owners or managers of the school property. The cost of that protection is a cost of maintenance and management. In the absence of insurance, damages to any one entitled to recover against the school district for its failure to fulfill its duties would be paid by the district, and the district would also bear the cost of defending the actions brought against it. If a district provided for such risks by maintaining reserves to meet claims for injury as they arose, the current contributions to such reserve funds would be costs of maintenance and management just as would the costs of upkeep and repair to minimize the risk of injuries. Similarly, insurance premiums on a policy protecting the district against liability for failure to fulfill its duties as to maintenance and management of its property are part of the cost of such maintenance and management. If a public meeting in a school auditorium attracts people who otherwise would not enter the premises, and there-

fore enlarges the risk of injuries, the district is not thereby relieved of liability as owner and manager of the property. In that capacity it must assume the expense of insurance as it does the expense of lighting, heating, and janitorial service.

Although such costs would enter into any rental, the school district cannot require the payment of rent for meetings pursuant to the Civic Center Act, if admission fees are not charged. Nor can it require the sponsors of a meeting to compensate the district in any other manner for costs of maintenance and management ensuing from the holding of a meeting in a school building. The district must bear the burden of costs attendant upon public meetings in school buildings for the purposes specified in the Civic Center Act, just as it bears the burden of costs of regular school activities. The Legislature, in the Civic Center Act, explicitly makes it the duty of the school district to grant "free" the use of schoolhouses, property, and grounds for the purposes stated in the act. (§ 19437.) The use of such property would not be free if the school district required the sponsors of a meeting to share the costs of maintenance and management of the buildings and grounds or any part thereof. The Civic Center Act not only provides school buildings free of charge but facilitates the use of such property for the public purposes specified in the act, by providing in section 19439 that the school district shall bear the expenses attendant upon the public use of the property.

If the right to use a school building unencumbered by expenses for public liability insurance were not already established by section 19437, it would follow from section 19439, whose puprose it is to relieve those who hold a meeting in a school building pursuant to the Civic Center Act of all expenses incident to the use of the building. Section 19439 charges the district not only with the expenses for the enumerated conveniences but with all "other necessary expenses in connection with the use of public school buildings." Respondent board contends that under the *ejusdem generis* rule, the words "other necessary expenses" relate only to expenses for facilities and services similar to those enumerated. It seems clear, however, that the Legislature enumerated the expenses that most commonly occur, adding the accompanying phrase "other necessary expenses" to cover whatever necessary expenses might arise other than

the most common ones. Its enumeration of the most common ones carries no implication that other necessary expenses should be borne by the users of a school building merely because they do not resemble the ones enumerated. The qualifying adjective "necessary" establishes the kinship between the expenses enumerated and other expenses, and therein lies the key to the Legislature's intention that all necessary expenses are to be borne by the district. The theory that "necessary" designates only those expenses that bear a resemblance as well as a kinship to those enumerated is hardly tenable, for it would lead to an imposition of necessary expenses upon the users of a school building that would in effect nullify their right to the free use of the building. The import of "other necessary expenses" is as broad as "all necessary expenses" (Ed. Code, § 24410), which the district must bear if school property is used for community recreation pursuant to chapter 4, division 12 of the Education Code. The Legislature expressly provided in that chapter (§ 24408) that the use of the school property for recreation shall not restrict or otherwise affect the use of the property under the Civic Center Act, thus making the first use subordinate to the second. Yet all necessary expenses incident to recreational uses of school property must be borne by the school district. Hence the Legislature could hardly have intended to impose on the sponsors of a meeting in a school building under the Civic Center Act any of the necessary expenses incident to the use of the building for that meeting. If the expense of public liability insurance is necessary to such a meeting, it must be borne by the school district under section 19439.

This construction of the Civic Center Act is compelled not only by its wording but by the purpose of the Legislature to make school buildings centers of free public assembly insofar as such assembly does not encroach upon the educational activities, which constitute the primary purpose of the schools. The purpose of the Legislature would be frustrated if petitioners' right to the free use of the school auditorium were nullified by the requirement that they furnish public liability insurance. It follows that the regulation adopted by respondent board is invalid.

Since the board cannot require the furnishing of a policy of public liability insurance as a condition for the use of

a school auditorium under the Civic Center Act, it is unnecessary to consider petitioners' arguments that the exemptions authorized in the regulation are unreasonably discriminatory and would enable the board to act as a censor by imposing the requirement arbitrarily upon those groups whose views it disapproves.

Let the peremptory writ issue forthwith.

Gibson, C. J., Shenk, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I concur in the views expressed in the opinion prepared by Mr. Justice Traynor, but I am also of the opinion that the writ should issue compelling the board of education to grant the permit for the use of the auditorium without the requirement that petitioner furnish to said board a policy of public liability insurance, for the reason that, in my opinion, the attempted classification of organizations contained in the resolution adopted by said board on September 28, 1943, constitutes an unreasonable and discriminatory regulation which purports to repose in said board unlimited discretion to determine which "organizations, clubs or associations," are "organized for general character building, welfare purposes, or in connection with the national war effort," and thus may be exempted from the requirement of furnishing such a policy. Hence, the power to censor is thus lodged in the members of the board. This opens the door to permit the board to discriminate in favor of organizations and groups which they like and against those they do not like. Such discrimination is in direct violation of the constitutional guarantees of freedom of speech and assembly. The constitutional mandate which confers these rights contemplates that they should be exercised without discrimination. It does not mean that they may be exercised freely by some and that others may exercise them only after complying with burdensome restrictions, even if such restrictions are such that may be complied with. On the right to give expression to ideas there should be no restrictions except when elements of clear and present danger exist.

It may be true that the Legislature was under no constitutional obligation to dedicate school buildings as civic centers in which citizens and groups may hold public meetings, but once the Legislature made that dedication, the use to be

made by the people in conducting public meetings at such civic centers may not be subject either to censorship, arbitrary action or unconstitutional restrictions by the governing boards of education.

The constitutionality of a regulation having the tendency to abridge freedom of speech or assembly should be judged by the opportunities for censorship and discrimination inherent in it, and not alone by the regulation in actual administration. In *Cantwell* v. *Connecticut,* 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352], in discussing the provisions of a statute regulating the solicitation of funds by religious organizations, the Supreme Court said:

"But to condition the solicitation of aid for the perpetuation of religious views or systems upon a license, the grant of which rests in the exercise of a determination by state authority as to what is a religious cause, is to lay a forbidden burden upon the exercise of liberty protected by the Constitution." (See, also, *Largent* v. *Texas,* 318 U.S. 418 [63 S.Ct. 667, 87 L.Ed. 873] ; and *Murdock* v. *Pennsylvania,* 319 U.S. 105 [63 S.Ct. 870, 891, 87 L.Ed. 1292, 146 A.L.R. 81].)

When the case of *Hague* v. *C. I. O.,* 307 U.S. 496 [59 S.Ct. 954, 83 L.Ed. 1423], was pending before the Supreme Court of the United States, the American Bar Association's Special Committee on the Bill of Rights filed an amici curiae brief in support of the contention of the Committee for Industrial Organization. A summary of this brief is contained in 25 American Bar Association Journal commencing at page 7. After analyzing the decisions relative to the right of cities and public boards to exercise control over public property, the brief contains the following discussion which is applicable to the problem here involved. I quote from page 74 of said Journal:

"The true analogy to government ownership of parks and other property dedicated to public uses is furnished by a public utility, which must give service to all so long as this is consistent with the performance of its functions. It can regulate, but not discriminate. It can refuse to deal with those who interfere with its functions or with other users of its service, or when the available services are exhausted. We already recognize this principle as applied to governmental substitutes for private utilities. Thus a municipal street railway can eject 'drunks' and set a limit on overcrowding, but nobody contends that it can refuse to trans-

port members of unpopular groups even if other passengers express a dislike for them.

"In the same way, the parks can be regulated in a manner consistent with their purposes, one of the most important of which is the right of free assembly therein for public discussion at reasonable times and places. Disorderly persons can be excluded, because they interfere with peaceable users of the parks like drunks in the municipal trolley car. Open-air meetings can be assigned to a particular park or a particular area, just as passengers can be assigned to particular seats or told to move away from the door. If all the available space is occupied and there is no more room for meetings, permits can stop, just as a full municipal street car can refuse to take on passengers. But we submit that law-abiding Democrats or Republicans or Communists or unionists or members of the American Civil Liberties Union can no more be constitutionally kept out of empty park spaces reasonably suitable for open-air meetings than they can be ejected from an empty municipal trolley car, or be refused current from a municipal power plant.

"In sum, a city is required to furnish its municipal services to all, subject only to reasonable rules. Surely this principle is no less applicable when those services include the making available of space for open-air meetings, in pursuance of the right of assembly that is guaranteed by the Constitution of the United States.

"The basis of the right of assembly is the substitution of the expression of opinion and belief by talk rather than force; and this means talk for all and by all. . . ."

The First Amendment to the Constitution of the United States was adopted because of the fear of the people that those in power might attempt by law to prohibit the free exercise of the right to worship or abridge "freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The people of that generation had witnessed the abuse of power by many of those in whom it was reposed. Washington knew, as few men did, that the inherent danger which threatened the overthrow of constitutional liberties was, as he said, "the love of power and proneness to abuse it, which predominates in the human heart," ever tempting the administrators of law and justice to override the constitutional guarantees of human rights. It finally required the adoption

of the Fourteenth Amendment to extend to the people of the several states the rights guaranteed by the First Ten Amendments. But still the abuse of power continued and will continue so long as those who are permitted to exercise it are swayed by considerations other than those of justice, fairness and equality.

It has been said that: "Power is a bell which prevents those who set it pealing from hearing any other sound." In the last analysis it is for the courts to declare the extent to which administrative power may be exercised in the light of the constitutional and statutory provisions fixing the limits of such power.

EDMONDS, J.—Considering the record in this proceeding, I find no basis for the conclusion that the court is not concerned "with the board's authority to insure the district against . . . [public liability with respect to its school buildings and grounds when used for purposes specified in the Civic Center Act] (see Ed. Code, § 1029) or with the exercise of its discretion in determining whether such insurance is necessary, but only with the question whether the board can require others to pay the costs of such insurance." In connection with the demands of the petitioner for the use of the auditorium, there had been filed with the Board of Education an affidavit made by Paul Schnur in behalf of various organizations affiliated with the San Francisco Industrial Union Council and 13 others, including the San Francisco Federation of Voters Leagues and the National Association for the Advancement of the Colored People. There is widespread conviction among the thousands of members in these organizations, the affiant declared, that the program of Gerald L. K. Smith is intended "to incite to violence by setting race against race, religion against religion, white against black, in an atmosphere of hatred and violence . . . all in order to create riots, terror and chaos . . ." According to the affidavit of Schnur, the people represented by him "have read of the riots which followed close upon . . . [the] public meetings and speeches [of Smith] in such cities as Detroit, New York and Los Angeles; . . . [and] will not allow Smith to conduct a campaign of terror and violence without protest . . ."

With this affidavit before it, the board of education was confronted with the question as to its liability for injury to persons or property in the event that it granted the applica-

tion for the use of the school auditorium and there was a riot or other violence. Mr. Justice Traynor discusses that liability solely from the the standpoint of responsibility for negligence in connection with the maintenance or use of the building. But there may be liability without fault. The doctrine is applicable, it is said, ''where, even though the defendant's conduct is socially desirable, the danger which it threatens to others is unusually great, and will be great even though the enterprise is conducted with every possible precaution. Because of the unusual gravity of the risk, he is held liable for acts which in themselves are regarded as reasonable. The basis of liability is his intentional behavior in exposing the community to such a risk. The conduct which is dealt with here occupies a middle ground; it is conduct which has so much social utility that it will not be treated as wrongful in itself, and will not be prohibited or enjoined in advance, but not so much that the defendant may be allowed to carry it on without liability at the expense of actual damage to his neighbors.'' (Prosser on Torts, p. 429.)

The application of the organization sponsoring Smith to use the school property came to the board of education with at least a prima facie showing that there had been riots at meetings of a similar character held in other cities and the consequent possibility of suits for damages in the event of violence at a meeting addressed by Smith in the Commerce High School. Under these circumstances, the requirement of the board for public liability insurance is not an unreasonable one. A majority of the court impliedly, if not directly, so hold, but they say that if such insurance is necessary, the premium for the policy must be paid by the school district as an expense specified in section 19439 of the Education Code. However, the board of education has no authority to procure public liability insurance with full coverage against responsibility for injuries to persons or property. Under the Education Code the district may only insure its liability and the personal liability of the members of the board ''for damages by reason of death, or injury to person or property, as the result of any *negligent* act.''. (Italics added). (§ 1029.) Accordingly, by the decision of this court, the Board of Education is required to allow the use of school property for a meeting which, there is reasonable ground to believe, may result in violence or riot, but it cannot protect its members or the district with liability insurance for

the benefit of the public except as a private undertaking at private expense.

No one has an absolute right to hold a meeting in a public school, and the Legislature has declared that the use of any public school house and grounds "is subject to such reasonable rules and regulations as the governing board of the district prescribes." (Ed. Code, § 19433.) Free speech is one of our most cherished constitutional rights but it is subject to certain limitations. For example, as Mr. Justice Holmes laconically stated, the right of free speech does not permit one falsely to cry "Fire" in a crowded theatre. (*Schenck* v. *United States*, 249 U.S. 47 [39 S.Ct. 247, 63 L.Ed. 470].)

For these reasons, in my opinion, the writ of mandate should be denied.