[L. A. No. 25788. In Bank. Jan. 24, 1961.]

AMERICAN CIVIL LIBERTIES UNION OF SOUTHERN CALIFORNIA (a Corporation) et al., Petitioners, v. BOARD OF EDUCATION OF THE CITY OF LOS ANGELES, Respondent.

168

A. L. Wirin, Fred Okrand, Abraham Gorenfeld and Irwin Gostin for Petitioners.

Robert L. Bostick, Fred F. Cooper, Albert M. Bendich, Marshall W. Krause and Rudolph Pacht as Amici Curiae on behalf of Petitioners.

Harold W. Kennedy, County Counsel, and Ronald L. Schneider, Deputy County Counsel, for Respondent.

DOOLING, J.—Petitioners seek a writ of mandate to compel the Board of Education of the City of Los Angeles to grant their application for the use of the John Burroughs Junior High School Auditorium in which to hold a series of monthly public meetings on the general theme of "The Bill of Rights in 1960." Their application was denied by respondent board because petitioners refused to furnish the "Statement of Information" as required by section 16565 of the Education Code, which implements section 16564 of the same code (formerly §§ 19440 and 19441).

The pertinent portion of section 16564 reads: "Any use, by any individual, society, group, or organization for the commission of any act intended to further any program or movement the purpose of which is to accomplish the overthrow of the Government of the United States or of the State by force, violence, or other unlawful means shall not be permitted or suffered." Implementing section 16565, as here material, provides: "No governing board of a school district shall grant the use of any school property to any person or organization for any use in violation of Section 16564.

"For the purpose of determination by such governing board whether or not any individual, society, group or organization applying for the use of such school property intends to violate Section 16564, the governing board shall require the making

and delivery to such governing board, by such applicant of a written statement of information in the following form:

"STATEMENT OF INFORMATION

"The undersigned states that, to the best of his knowledge, the school property for use of which application is hereby made will not be used for the commission of any act intended to further any program or movement the purpose of which is to accomplish the overthrow of the Government of the United States by force, violence or other unlawful means;

"That ...................., the organization on whose behalf he is making application for use of school property, does not, to the best of his knowledge, advocate the overthrow of the Government of the United States or of the State of California by force, violence, or other unlawful means, and that, to the best of his knowledge, it is not a communist-action organization or communist-front organization required by law to be registered with the Attorney General of the United States. This statement is made under the penalties of perjury.

..........................
(Signature)

"The school board may require the furnishing of such additional information as it deems necessary to make the determination that the use of school property for which application is made would not violate Section 16564 of the Education Code."

Petitioners refused to furnish the prescribed statement primarily on the ground that such test oath requirement abridged both the state and federal constitutional guarantees of freedom of speech and assembly. (U.S. Const., Amendments I and XIV; Cal. Const., art. I, §§ 9, 10.)

The sections of the Education Code here under attack were obviously adopted in an attempt to meet the constitutional objections to the former section 19432 of the Education Code, which we held unconstitutional in *Danskin* v. *San Diego Unified Sch. Dist.*, 28 Cal.2d 536 [171 P.2d 885]. That section prohibited in express terms the use of the "civic center" in any school building by "any society, group, or organization which has as its object or as one of its objects . . . the overthrow or the advocacy of the overthrow of the present form of government of the United States or of the State by force, violence, or other unlawful means." We held in Danskin (28 Cal.2d pp. 545-546) that while "[t]he state is under

no duty to make school buildings available for public meetings . . . [i]f it elects to do so . . . it cannot arbitrarily prevent any member of the public from holding such meetings . . . [n]or . . . make the privilege of holding them dependent on conditions that would deprive any members of the public of their constitutional rights. ▮ A state is without power to impose an unconstitutional requirement as a condition for granting a privilege even though the privilege is the use of state property.''

We further quoted from *De Jonge* v. *Oregon*, 299 U.S. 353 [57 S.Ct. 255, 81 L.Ed. 278] : ''The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as criminals on that score. The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects. If the persons assembling have committed crimes elsewhere, if they have formed or are engaged in a conspiracy against the public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge. We are not called upon to review the findings of the state court as to the objectives of the Communist Party. Notwithstanding those objectives, the defendant still enjoyed his personal right of free speech and to take part in a peaceable assembly having a lawful purpose, although called by that party.'' (28 Cal.2d pp. 552-553.)

We concluded: ''When one searches deeper for the reason that motivates the prohibition of such meetings, there is no escaping the conclusion that the Legislature denies access to a forum in a school building to 'subversive elements,' not because it believes that their public meetings would create a clear and present danger to the community, but because it believes the privilege of free assembly in a school building should be denied to those whose convictions and affiliations it does not tolerate. What it does not tolerate it seeks to censor. (28 Cal.2d p. 545.) ▮ . . . Since the state cannot compel 'subversive elements' directly to renounce their convictions and affiliations, it cannot make such a renuncia-

tion a condition of receiving the privilege of free assembly in a school building. (28 Cal.2d p. 546.) . . . If it is unconstitutional for the state to prohibit certain persons or groups classified as 'subversive elements' from exercising their rights of free speech and assembly at places where others are allowed to speak and assemble, it is *a fortiori* unconstitutional to require proof from any persons or groups that they are not subversive elements.'' (28 Cal.2d p. 548.) Specifically with reference to De Jonge, quoted *supra,* we added: ''The De Jonge case cannot be distinguished on the ground that it involved a criminal statute, while the statute in the present case sought to suppress free speech and free assembly by requiring an administrative board to deny permits for meetings of those whose objects and affiliations are disapproved. In each case the state sought to suppress free speech and assembly and it is immaterial that it sought to accomplish that objective in the one case by threat of punishment and in the other by censorship.'' (28 Cal.2d p. 553.)

Having thus clearly held that the statute then before us was unconstitutional for denying to ''subversive groups'' the right to use school ''civic centers'' for assemblies and the exercise of the right to speak freely therein, without regard to the lawful or unlawful purpose or character of such meetings, we added: ''The state must be on the alert for any clear and present danger to the community, sensitive to the warning signals, the ambiance in which a forum is planned, the atmosphere that envelops it. It cannot look with equanimity upon those whose words or actions have already left in their wake a trail of violence.

''Always it must distinguish, however, between speech, no matter how unorthodox, that remains on a theoretical plane, and speech, no matter how skillfully intoned, that creates a clear and present danger to the community.'' (28 Cal.2d pp. 553-554.)

The Legislature in enacting sections 16564 and 16565 was attempting, without doubt, to bring its regulations within the constitutionally permitted area, thus adverted to by us in Danskin, by limiting its regulation to the permissible field of prevention of speech and assembly in school buildings which would constitute ''a clear and present danger to the community.'' It is argued by respondent that it has done so. On the other hand, petitioners point to the language of section 16564: ''Any use . . . for the commission of any act intended

to further any *program* or *movement the purpose of which* is to accomplish the overthrow of the Government . . . by force, violence, or other unlawful means . . ." (emphasis added) ; and argue that the language is so broad in its scope as to include acts which would not create the clear and present danger which permits the preventive or punitive action of the state, and would prohibit speech or other conduct "that remains on a theoretical plane" as well. We accept the argument of respondent in this particular that the quoted language, in order to avoid this constitutional objection, should be construed to reach and prohibit only such "acts" as would constitute a "clear and present danger," as that term has been construed by the United States Supreme Court. This concession, however, is of little importance when we turn to the requirements of section 16565. ■ That section as presently in force provides: ". . . the governing board *shall require* the making and delivery . . . of a written statement of information *in the following form:* . . . That . . . . . . . . . . . . , the organization on whose behalf he is making application . . . does not . . . advocate the overthrow of the Government . . . by force, violence, or other unlawful means, and that . . . it is not a communist-action organization or communist-front organization required by law to be registered with the Attorney General of the United States." (Emphasis added.) The emphasized words "shall require . . . in the following form" are mandatory on the school board and on the applicant. " 'Shall' is mandatory and 'may' is permissive." (Ed. Code, § 36, formerly § 19.) The section requires the applicant *to furnish the statement in this form,* without exception, and it was the refusal of the applicant to furnish the required statement that resulted in the denial of its application to use the school's "civic center." ■ The requirement that the applicant shall deny in the required statement that the organization is one of those expressly mentioned therein bars the door, because the applicant cannot truthfully furnish the statement required, to every organization included in that portion of the quoted language. Thus if an organization does "advocate the overthrow of the Government . . . by force, violence, or other unlawful means" or is "a communist-action organization or communist-front organization required by law to be registered with the Attorney General," the governing board, unless the applicant is willing to perjure himself, never reaches the decision required in the case of all

other applicants by section 16564, since by the express terms of section 16565 the governing board "shall," i.e., "must," require the statement, which in such case cannot be truthfully made, before it can act upon the application to use the school property for the proposed meeting. The present statute thus has the same vice which caused us to strike down its predecessor section in Danskin. It closes the doors to public meetings of the proscribed organizations, while leaving them open to all others, even though the particular meeting may be for an entirely lawful purpose. It thus, somewhat more indirectly, prevents assembly and free speech in school buildings by certain organizations because it disapproves of the organizations and not because of what those organizations may intend to say or do therein. This is exactly the type of regulation held unconstitutional by us in Danskin and by the United States Supreme Court in De Jonge, *supra.*

Respondent suggests that a difference now exists between the facts and decisional law considered by this court in Danskin and by the United States Supreme Court in De Jonge (1) because it has since been determined by the Legislature and the Congress that the Communist Party is a continuing conspiracy to overthrow the Government of the United States and the State (Gov. Code, § 1027.5; 50 U.S.C.A. §§ 781, 841) and (2) because the scope of the clear and present danger rule has been broadened and relaxed by later decisions of the United States Supreme Court.

Addressing ourselves to the second point, it is unnecessary again to review the development of the "clear and present danger" rule in the decisions of the United States Supreme Court up to the time that we decided Danskin, since we cited and quoted extensively from the cases in that court on this subject in the Danskin case. (28 Cal.2d pp. 542-545.) It is argued that the rule as theretofore declared was broadened and relaxed in *Dennis* v. *United States,* 341 U.S. 494 [71 S.Ct. 857, 95 L.Ed. 1137]. But the true reach of Dennis can only be properly assessed by reading it in connection with *Yates* v. *United States,* 354 U.S. 298 [77 S.Ct 1064, 1 L.Ed.2d 1356]. The court in Yates at page 320 reiterates the well-established distinction, relied upon by us in Danskin, between "the advocacy and teaching of concrete action for the forcible overthrow of the Government" (which is not within the protection of the First Amendment) and "of principles divorced from action" (which falls within the First Amendment's

protection). The court in Yates added: "The essence of the Dennis holding was that indoctrination of a group in preparation for future violent action, as well as exhortation to immediate action . . . is not constitutionally protected when the group is of sufficient size and cohesiveness, is sufficiently oriented towards action, and other circumstances are such as reasonably to justify apprehension that action will occur. This is quite a different thing from the view of the District Court here that mere doctrinal justification of forcible overthrow, if engaged in with the intent to accomplish overthrow, is punishable *per se* under the Smith Act. That sort of advocacy, even though uttered with the hope that it may ultimately lead to violent revolution, is too remote from concrete action to be regarded as the kind of indoctrination preparatory to action which was condemned in Dennis." (354 U.S. pp. 321-322.) Indeed, the very basis of the Yates holding was that mere proof of membership in the Communist Party *per se,* divorced from proof of "advocacy and teaching of concrete action for the forcible overthrow of the Government" is insufficient to support a conviction under the Smith Act. ▇▇▇ We can find no such broadening of the definition of the "clear and present danger rule" in Dennis as explained in Yates as to justify the exclusion of Communists and Communist affiliates from the exercise of the rights of free speech and peaceable assembly for lawful purposes, or to lead to any logical conclusion that just because they are Communists or Communist affiliates they will *per se* advocate and teach in a public meeting the concrete action of forcible overthrow of the Government if permitted to hold such public meeting in a school building.

▇▇▇ The other argument, that the findings that the Communist Party constitutes a continuing conspiracy to overthrow the Government by force and violence justifies the exclusion from the use of school buildings of them and their affiliates, rests principally on the case of *American Communications Assn., C.I.O.* v. *Douds,* 339 U.S. 382 [70 S.Ct. 674, 94 L.Ed. 925]. In that case, in which only six of the nine justices participated, the court upheld the requirement of the Act of Congress (§ 9, subd. (h) of the National Labor Relations Act, as amended by the Labor Management Relations Act of 1947, 29 U.S.C. § 159, subd. (h)) requiring each officer of a labor union to file with the National Labor Relations Board an affidavit that he is not a member of the Communist Party or

affiliated with it, and does not believe in, and is not a member of nor supports any organization that believes in or teaches, the overthrow of the United States Government by force or any illegal or unconstitutional means, as a condition to recourse by the union to the board. A majority of the court upheld this requirement against the contention that it unconstitutionally infringed the right of such officers to freedom of speech (more properly, perhaps, the cognate right of freedom of association, see, e.g., *N.A.A.C.P.* v. *Alabama*, 357 U.S. 449 [78 S.Ct. 1163, 2 L.Ed.2d 1488]) on the ground that Congress had enacted the provision to prevent ''political strikes,'' and that this action was justified by evidence taken before a congressional committee ''which tended to show that Communists and others proscribed by the statute had infiltrated union organizations not to support and further trade union objectives . . . but to make them a device by which commerce and industry might be disrupted when the dictates of political policy required such action.'' (339 U.S. p. 389.) Also ''that Communist leaders of labor unions had in the past and would continue in the future to subordinate legitimate trade union objectives to obstructive strikes when dictated by Party leaders, often in support of the policies of a foreign government . . . some union leaders who hold to a belief in violent overthrow of the Government . . . likewise regard strikes and other forms of direct action designed to serve ultimate revolutionary goals as the primary objectives of labor unions which they control.'' (339 U.S. p. 388.) The court carefully pointed out at page 396 that the question of freedom of speech in that case was not directly, but only tangentially, involved, saying: ''Government's interest here is not in preventing the dissemination of Communist doctrine or the holding of particular beliefs because it is feared that unlawful action will result therefrom if free speech is practiced. Its interest is in protecting the free flow of commerce from what Congress considers to be substantial evils of conduct that are not the product of speech at all. Section 9 (h), in other words, does not interfere with speech because Congress fears the consequence of speech; it regulates harmful conduct which Congress has determined is carried on by persons who may be identified by their political affiliations and beliefs.''

The inappositeness of this reasoning to the statute before us is clear. The very purpose which the court stated was not

present in Douds is the only purpose of the Legislature here, to interfere, not tangentially for another legitimate purpose with speech, but to prevent the speech itself. Moreover, the parallel claimed does not exist. In Douds the evidence before Congress established that strikes had been called by subversive union leaders solely for disruptive political purposes without regard to the union's welfare. The findings of Congress and our Legislature that the Communist Party is a continuing conspiracy etc. is not a parallel. It would only be parallel if Congress and the Legislature had found that Communists and Communist affiliates had advocated or taught the concrete action of the violent and unlawful overthrow of the Government in public meetings. No such finding was made and we apprehend that no such finding could be supported by any substantial evidence. Indeed it is the essence of a *conspiracy*, such as was found, to operate in secrecy and not in the open light of day or in public meetings in schools or elsewhere.

Going to a broader consideration, giving regard to the purpose behind this legislation and giving section 16564 its full scope, without regard to the requirement that in order to secure consideration of its application at all, the applicant must deny all Communist affiliation, we would still be confronted with a serious constitutional question of the extent to which what amounts to a prior restraint on the exercise of the rights of free speech and assembly can properly go, and the factual basis necessary to the exercise of such a prior re-
 █8 ] That the power of respondent board to refuse the use of the school to an applicant upon making the finding required by section 16564 amounts to a prior restraint is clear, since it forecloses the use of the school and prevents the applicant from *there* holding its meeting upon a prior determination of the board.

 The rights of freedom of assembly and of speech guaranteed by the Constitution, like the cognate rights of freedom of the press and of petition, have a paramount and preferred place in our democratic system. As pointed out by Mr. Justice Rutledge in *Thomas* v. *Collins*, 323 U.S. 516, at page 530 [65 S.Ct. 315, 89 L.Ed. 430], "the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment." "That priority," he adds, "gives these liberties a sanctity and a sanction not permitting dubious intrusions. And it is the character of the

right, not of the limitation, which determines what standard governs the choice. (Citation.)

"For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger. The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights rest on firmer foundation. Accordingly, whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending. Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation. It is therefore in our tradition to allow the widest room for discussion, the narrowest range for its restriction, particularly when this right is exercised in conjunction with peaceable assembly. It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable."

Against the exercise of these paramount and preferred rights, the Legislature has attempted to set up a system of prior restraint. Upon a finding by the school board that the school's "civic center" *will be* used "for the commission of any act intended to further . . . the overthrow of the Government . . . by force, violence, or other unlawful means," the school board is empowered to deny the use of the center in advance. This amounts to a censorship in advance of the right of assembly and free speech upon the mere determination of a probability of its future misuse. Prior censorship upon such a prophetic finding can certainly only be justified, if at all, upon the clearest sort of showing that such misuse will with reasonable certainty occur. The state and the federal government can, as the federal government has done in the Smith Act, make the actual commission of such acts criminal. It seems obvious that attempts at censorship by prior restraint should be more closely scrutinized to detect constitutional infirmity than such *post hoc* methods of restraint by criminal sanction. The danger of censorship in advance is that, in attempting to prevent the commission of forbidden acts in advance, it will also prevent lawful assemblies and the lawful exercise of free speech upon

an erroneous (even if plausible) finding in advance that the applicant intends to engage in unlawful assembly and unlawful speech. In discussing the prior censorship of the exercise of the freedom of the press, the court said in *Lovell* v. *Griffin,* 303 U.S. 444, at page 451 [58 S.Ct. 666, 82 L.Ed. 949] : ''The struggle for the freedom of the press was primarily directed against the power of the licensor. It was against that power that John Milton directed his assault by his 'Appeal for the Liberty of Unlicensed Printing.' And the liberty of the press became initially a right to publish *'without* a license what formerly could be published only *with* one.' While this freedom from previous restraint upon publication cannot be regarded as exhausting the guaranty of liberty, the prevention of that restraint was a leading purpose in the adoption of the constitutional provision.'' (Emphasis the court's.) See the very extensive discussion of the whole subject of prior restraint in *Near* v. *Minnesota,* 283 U.S. 697, 713-723 [51 S.Ct. 625, 75 L.Ed. 1357] ; cf. *Hague* v. *C.I.O.,* 307 U.S. 496, 516 [59 S.Ct. 954, 83 L.Ed. 1423] ; *Schneider* v. *State,* 308 U.S. 147, 161 et seq. [60 S.Ct. 146, 84 L.Ed. 155] ; *Thornhill* v. *Alabama,* 310 U.S. 88, 95-96 [60 S.Ct. 736, 84 L.Ed. 1093] ; *Cantwell* v. *Connecticut,* 310 U.S. 296, 306 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352].

It does not appear that disclosure of membership in the Communist Party or any of its affiliates or supporting organizations has a reasonable tendency to prove that the forbidden acts would be committed in a public meeting in a school building. The Dennis and Yates cases, the many congressional and legislative investigations, and the intensive and not always successful efforts of the Federal Bureau of Investigation to uncover subversion all teach us that acts of unlawful incitement when committed are secretly committed in carefully selected groups, not openly in public meetings. In Yates, for example, no criminal incitement was proved in any public meeting and no such criminal incitement was ever published in the Daily People's World. (See 354 U.S. pp. 331, 333.)

We cannot escape the conclusion that the legislation under attack requires an unconstitutional disclosure and attempts to create an unconstitutional power of prior restraint upon the rights of free assembly and free speech. It has more than once been suggested that in the struggle against the Communist threat, we must be careful not to adopt the Communist methods lest we sacrifice our precious freedoms in the very

effort to preserve them. We said in Danskin (28 Cal.2d p. 554): "It may seem ironic that others who hold such beliefs" (i.e., the overthrow of government by violence) "may seek from the state the privilege of a public forum. But when the principles of free speech and peaceable assembly are at stake, the state has more to gain than to lose by a generous tolerance of the convictions and affiliations of its many citizens so long as they present no clear and present danger to the community." ▆▆▆ In the balancing of the preferred rights of peaceable assembly and freedom of speech against the more than doubtful likelihood that Communists or Communist supporters would be so rash as to subject themselves to the certainty of criminal prosecution by committing "acts" in a public assembly proscribed by this statute, the balance should fall on the side of protecting the constitutionally guaranteed freedoms.

▆▆▆ As appears from their petition for writ of mandate, petitioners sought monthly meeting dates in the Los Angeles school auditorium from January through June 1960. Since the June date has now passed, the question arises as to whether the proceeding presents issues that should be judicially determined: as a guide for such future applications as might be made for the school premises; for the settlement of public questions necessarily involved; and because of the unlikelihood that a final judicial decision could ever be made within the limited time of a series of proposed meeting dates. To overcome the effect of the expiration of the June date, petitioners inform us that they have in fact made another application for a new series of monthly meeting dates at the John Burroughs Junior High School from October 1960 through June 1961.

Petitioners rely on *Rattray* v. *Scudder,* 67 Cal.App.2d 123 [153 P.2d 433], where mandate was sought directing the Real Estate Commissioner to set aside an order revoking a real estate broker's license. The superior court directed the issuance of the writ and awarded costs to petitioner. The Real Estate Commissioner appealed. After the writ was issued but before the hearing on appeal, the term of the license had expired. The licensee moved to dismiss the appeal as moot. In denying the motion, the court said: "As a practical matter this judgment [for issuance of the writ], if allowed to stand, will have a direct bearing and real effect upon any renewal of the respondent's license. . . . Moreover, important

public questions are involved both directly, with respect to this judgment, and indirectly, through the effect on future appeals in such cases which could not be determined before the license in question had expired." (67 Cal.App.2d p. 128.)

We are satisfied that we should not treat the question as moot, and that petitioner's continuing right to make application for the use of the school facilities for their meetings is properly at issue.

In view of our conclusions herein expressed, other points urged by petitioners need not be considered.

Let a peremptory writ of mandate issue directing respondent to act upon any pending or future application by petitioners to be allowed to hold a public meeting or meetings in the John Burroughs Junior High School Auditorium without requiring from petitioners a "Statement of Information" in the form prescribed by section 16565 of the Education Code.

Gibson, C. J., Traynor, J., and Peters, J., concurred.

WHITE, J.—I dissent.

We are here confronted with the simple question of whether the Legislature may ordain that those who seek permission to use our public schools, erected primarily for educational purposes, may be required as a condition to the enjoyment of such use to declare that the school property will not be used for the commission of any *act* intended to further any program or movement the purpose of which is to accomplish the overthrow of the government of the United States or of the State of California by force, violence or other unlawful means, and that to the best of the applicant's knowledge, the organization he represents is not a communist-action organization or communist-front organization required by law to be registered with the Attorney General of the United States. To deny school boards the right to make this inquiry is a radical departure from what this court held in *Payroll Guar. Assn.* v. *Board of Education,* 27 Cal.2d 197 [163 P.2d 433, 161 A.L.R. 1300], wherein at page 200 it said "The respondent board may not only make reasonable regulations with regard to the use of the school auditorium for authorized purposes but may deny an application for its use if (1) such use would further, directly or indirectly, the overthrow of the present government of the United States or any State, Territory or Possession thereof, by force or violence or other unlawful means, . . . ." And again in *Danskin* v. *San Diego Unified Sch. Dist.,*

28 Cal.2d 536, 553-554 [171 P.2d 885], we said ''The state must be on the alert for any clear and present danger to the community, *sensitive to the warning signals,* the ambiance in which a forum is planned, the atmosphere that envelops it. *It cannot look with equanimity upon those whose words or actions have already left in their wake a trail of violence.*

''Always it must distinguish, however, between speech, no matter how unorthodox, that remains on a theoretical plane, *and speech, no matter how skillfully intoned, that creates a clear and present danger to the community.*'' (Emphasis added.)

The statutes here in question are designed to protect the people not against what communists or kindred subversive organizations or individuals advocate or believe, but against what the Legislature has considered they *have done* and are *likely* to do again. Conceding that restriction on speech and assembly cannot be sustained unless the evil itself is ''substantial'' and ''relatively serious,'' or sometimes ''extremely serious'' thus creating what is commonly called ''clear and present danger,'' nevertheless, as was said in *Dennis* v. *United States,* 341 U.S. 494, 509 [71 S.Ct. 857, 95 L.Ed. 1137], ''Overthrow of the Government by force and violence is certainly a substantial enough interest for the Government to limit speech. Indeed, this is the ultimate value of any society, *for if a society cannot protect its very structure from armed internal attack,* it must follow that no subordinate value can be protected. If, then, this interest may be protected, the literal problem which is presented is what has been meant by the use of the phrase 'clear and present danger' of the utterances bringing about the evil within the power of Congress to punish.

''*Obviously, the words cannot mean that before the Government may act, it must wait until the putsch is about to be executed, the plans have been laid and the signal is awaited. If Government is aware that a group aiming at its overthrow is attempting to indoctrinate its members and to commit them to a course whereby they will strike when the leaders feel the circumstances permit, action by the Government is required.* The argument that there is no need for Government to concern itself, for Government is strong, it possesses ample power to put down a rebellion, it may defeat the revolution with ease needs no answer. For that is not the question. Certainly an attempt to overthrow the Government by force, even though

doomed from the outset because of inadequate numbers or power of the revolutionists, is sufficient evil for Congress to prevent. The damage which such attempts create both physically and politically to a nation makes it impossible to measure the validity in terms of the probability of success, or the immediacy of a successful attempt.'' (Emphasis added.)

The majority opinion places its imprimatur upon a decision that holds that the people of the State of California must open their schools as forums wherein groups aiming at the destruction of the federal and state governments by force and violence may assemble and wherein those in attendance may be indoctrinated with that philosophy in preparation for future violent action. With this I cannot agree. ''It has been established by legislative findings and judicial decisions that the Communist Party is a continuing conspiracy against our government. [Citations.]'' (*Board of Education* v. *Mass*, 47 Cal.2d 494, 497-498 [304 P.2d 1015].) And the Legislature has declared that ''communism is a political theory that the presently existing form of government of the United States or of this State shall be changed by force, violence, or other unconstitutional means, to a totalitarian dictatorship.[1] . . .'' (Ed. Code, § 8455.)

---

[1]The Legislature of this state made the following finding in 1953 with respect to the world communism movement:

''(a) There exists a world-wide revolutionary movement to establish a totalitarian dictatorship based upon force and violence rather than upon law.

''(b) This world-wide revolutionary movement is predicated upon and it is designed and intended to carry into execution the basic precepts of communism as expounded by Marx, Lenin, and Stalin.

''(c) Pursuant to the objectives of the world communism movement, in numerous foreign countries the legally constituted governments have been overthrown and totalitarian dictatorships established therein against the will of the people, and the establishment of similar dictatorships in other countries is imminently threatening. The successful establishment of totalitarian dictatorships has consistently been aided, accompanied, or accomplished by repeated acts of treachery, deceit, teaching of false doctrines, teaching untruth, together with organized confusion, insubordination, and disloyalty, fostered, directed, instigated, or employed by communist organizations and their members in such countries.

''(d) Within the boundaries of the State of California there are active disciplined communist organizations presently functioning for the primary purpose of advancing the objectives of the world communism movement, which organizations promulgate, advocate, and adhere to the precepts and the principles and doctrines of the world communism movement. These communist organizations are characterized by identification of their programs, policies, and objectives with those of the world communism movement, and they regularly and con-

The legislation with which we are here concerned does not restrain speech or assembly as such. Its manifest objective is the protection of our public schools from the commission of

sistently cooperate with an endeavor to carry into execution programs, policies and objectives substantially identical to programs, policies, and objectives of such world communism movement.

"(e) One of the objectives of the world communism movement is to place its members in state and local government positions and in state supported educational institutions. If this objective is successful, propaganda can be disseminated by the members of these organizations among pupils and students by those members who would have the opportunity to teach them and to whom, as teachers, they would look for guidance, authority, and leadership. The members of such groups would use their positions to advocate and teach their doctrines and teach the prescribed Communist Party line group dogma or doctrine without regard to truth of free inquiry. This type of propaganda is sufficiently subtle to escape detection.

"There is a clear and present danger, which the Legislature of the State of California finds is great and imminent, that in order to advance the program, policies and objectives of the world communism movement, communist organizations in the State of California and their members will engage in concerted effort to hamper, restrict, interfere with, impede, or nullify the efforts of the State and the public agencies of the State to comply with and enforce the laws of the State of California and their members will infiltrate and seek employment by the State and its public agencies." (Gov. Code, § 1027.5.)

The Congress of the United States, in adopting the Internal Security Act of 1950, declared the dangers of the Communist movement in the following terms (Act of Sept. 23, 1950, ch. 1024, tit. I, § 2, 64 Stats. 987; 50 U.S.C.A. § 781):

"As a result of evidence adduced before various committees of the Senate and House of Representatives, the Congress hereby finds that—

"(1) There exists a world Communist movement which, in its origins, its development, and its present practice, is a world-wide revolutionary movement whose purpose it is, by treachery, deceit, infiltration into other groups (governmental and otherwise), espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship in the countries throughout the world through the medium of a world-wide Communist organization."

More recently, in adopting the Communist Control Act of 1954 (Public Law 637, ch. 886, 68 Stats. 775), our Congress expressed its awareness of the true nature of the Communist Party program and methods in the following findings:

"Sec. 2. The Congress hereby finds and declares that the Communist Party of the United States, although purportedly a political party, is in fact an instrumentality of a conspiracy to overthrow the Government of the United States . . . ." and "The Communist Party is relatively small numerically, and gives scant indication of capacity ever to attain its ends by lawful political means. The peril inherent in its operation arises not from its numbers, but from its failure to acknowledge any limitation as to the nature of its activities, and its dedication to the proposition that the present constitutional Government of the United States ultimately must be brought to ruin by any available means, including resort to force and violence. Holding that doctrine, its role as the agency of a hostile foreign power renders its existence a clear present and continuing danger to the security of the United States. . . ."

subversive acts therein, and asks the applicant for use of our school buildings only to state under oath that "to the best of his knowledge" the school property will not be used ". . . to further any program or movement, the purpose of which is to accomplish the overthrow of the Government of the United States [or of the state] by force, violence, or other unlawful means. . . ." Unless the applicant has knowledge that the school property is to be used for the advocacy of subversive acts, what other reason would serve to deter him from signing the Statement of Information? History, even in our own times, warns us that eternal vigilance is still the price of liberty and that a free people must not wait until "the plans have been laid and the signal is awaited" for violent action before taking steps to prevent the fruition of subversive propaganda. The statutes now engaging our attention do not proscribe the advocacy of abstract doctrine but are aimed at the teaching of concrete action for the *forcible* overthrow of the government. It therefore does no violence to due process nor to the principles enunciated by this court in the Danskin case, *supra,* relied upon by the majority opinion.

The statutes with which we are here confronted represent an effort by the Legislature of California to prevent the public school buildings in this state from becoming forums for the propagation and advocacy of *acts* of subversion, or *acts* intended to support subversive elements. This is well within the recognized right of government to protect itself from all enemies—domestic as well as foreign.

For the foregoing as well as the additional reasons advanced by Mr. Presiding Justice Fox, speaking for a unanimous court when this cause was pending before the District Court of Appeal, Second Appellate District, Division Two (*American Civil Liberties Union of So. Calif.* v. *Board of Education,* (Cal.App.) 5 Cal.Rptr. 215), I would discharge the alternative writ and deny the petition for a peremptory writ of mandate.

SCHAUER, J.—I concur in the reasoning and conclusions of Justice White and also am in full accord with, and by reference adopt, the opinion prepared for the District Court of Appeal (when this case was before that court, reported in (Cal.App.) 5 Cal.Rptr. 215) by Presiding Justice Fox and concurred in by Justice Ashburn and Justice pro tempore Kincaid.* For all of the reasons enunciated by Justices White,

*Assigned by Chairman of Judicial Council.

Fox, Ashburn and Kincaid the alternative writ should be discharged and the petition denied.

McComb, J., concurred.

Respondents' petition for a rehearing was denied February 21, 1961. Schauer, J., McComb, J., and White, J., were of the opinion that the petition should be granted.