[No. A050285. First Dist., Div. One. Dec. 20, 1990.]

GERZON P. DOMINGUEZ, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
KENNETH KIZER, as Director, etc., et al., Real Parties in Interest.

COUNSEL

Evelyn R. Frank, Stanley L. Dorn and Susan B. Drake for Petitioner.

No appearance for Respondent.

John K. Van de Kamp, Attorney General, Stephanie Wald, and Winifred Y. Smith, Deputy Attorneys General, for Real Parties in Interest.

OPINION

STEIN, J.—Petitioner, Gerzon P. Dominguez, an undocumented alien, suffers from leukemia. As an undocumented alien, he is eligible only for restricted Medi-Cal (California medical assistance program) benefits which, in general, provide emergency-related services. Petitioner's physician has determined that petitioner will die from his disease unless a bone marrow transplant is performed. The California Department of Health Services contends that the transplant is not within the scope of available Medi-Cal benefits. The sole issue raised in this proceeding is the meaning of that part of section 14007.5 of the Welfare and Institutions Code[1] that defines the Medi-Cal services available for those with petitioner's immigration status. We conclude that based upon the facts of this case, the bone marrow transplant is a covered service under section 14007.5, subdivision (d).

PROCEDURAL AND FACTUAL BACKGROUND

Petitioner, the son of a United States citizen, has been continuously residing in California since February 1988. In October 1989, he developed acute symptoms of leukemia and was admitted to the University of California Medical Center where he was treated with chemotherapy to destroy a substantial portion of his bone marrow which contained the cancer cells. Medi-Cal paid for this treatment, which included 40 days of hospitalization, as an emergency procedure. The intended result of the treatment was achieved, and petitioner temporarily achieved normal appearing bone marrow.

In order to completely eliminate the cancer cells from petitioner's body a bone marrow transplant or additional chemotherapy was necessary. Neither of these treatments, however, could be administered until petitioner

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

improved to a temporarily normal status. Petitioner was discharged from the hospital on November 20, 1989, and monitored until a bone marrow transplant could be performed. When petitioner's blood count became normal, a treatment authorization request was submitted to the state seeking approval for Medi-Cal payment for the bone marrow transplant. The request was denied, for the reason that undocumented aliens are entitled only to emergency services.

Petitioner sought a writ of mandate and requested injunctive and declaratory relief in the superior court. He sought to enjoin the state from refusing to provide Medi-Cal benefits for his treatment and asked the court to declare the state's policy in this regard to be contrary to the terms of section 14007.5, subdivision (d). The trial court denied relief.

On July 13, 1990, petitioner filed his petition for writ of mandate with this court and we issued an alternative writ.

DISCUSSION

*Impact of Subsequent Authorization of the Transplant*

On July 18, 1990, petitioner requested deferred action status from the Immigration and Naturalization Service (INS) and the state issued him a temporary, full-scope Medi-Cal card. This enabled him to obtain authorization for the bone marrow transplant[2] which was performed on August 7, 1990.

In light of these events, the state has argued that because the emergency necessitating this writ proceeding has passed, this petition is now moot. Petitioner argues that the issues involved in this petition affect the lives of many others and are appropriate for immediate resolution. He has filed a declaration that the average hospitalization following a bone marrow transplant is 49 days; that additional therapy for periods of up to 8 weeks may be necessary; and that a relapse requiring further treatment is possible. All of these possibilities would occur beyond petitioner's 30-day authorization period.

██ We believe that these representations establish a reasonable expectation that petitioner may be affected by the state's policy regarding emergency care in the near future. (*American Civil Liberties Union* v. *Board of*

---

[2] This temporary entitlement to full-scope benefits expires after 30 days if petitioner is unable to present evidence of a satisfactory immigration status. (§ 14007.5, subd. (e).) Petitioner's counsel submitted the declaration of an immigration attorney stating that INS officials have stated that it takes "years" to process such a request and obtain the necessary evidence.

*Education* (1961) 55 Cal.2d 167, 181-182 [10 Cal.Rptr. 647, 359 P.2d 45, 94 A.L.R.2d 1259].) Moreover, this is an issue of public importance which is almost certain to arise again. (*Johnson* v. *Hamilton* (1975) 15 Cal.3d 461, 465 [125 Cal.Rptr. 129, 541 P.2d 881].) For these reasons, even if petitioner is not currently directly affected by the challenged policy, we deem it appropriate to decide the merits of the issue at this time.

*Statutory Framework*

■ We begin our consideration of the case with a brief review of the relevant programs and their governing statutes. The Medicaid program is a joint federal and state assistance program. (42 U.S.C. § 1396 et seq.) The California program, Medi-Cal, is regulated by the provisions of section 14000 et seq. States receive federal financial participation for services covered by federal law. States are also free to provide additional medical coverage without federal financial participation. (*Dermegerdich* v. *Rank* (1984) 151 Cal.App.3d 848 [199 Cal.Rptr. 30].)

In 1986, Congress enacted the Omnibus Budget Reconciliation Act which, in part, codified the requirement that aliens must be admitted for permanent residence or otherwise permanently residing in the United States under "color of law" to be eligible for full-scope Medicaid benefits. (42 U.S.C. § 1396b(v).) Congress did, however, provide for federal financial participation for restricted benefits for specified emergency services to undocumented aliens.[3]

In 1988, the California Legislature enacted section 14007.5. Section 14007.5 does not, on its face, limit California aliens to federal benefits.

---

[3] The federal statute provides:

"(1) Notwithstanding the preceding provisions of this section, except as provided in paragraph (2), no payment may be made to a State under this section for medical assistance furnished to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law.

"(2) Payment shall be made under this section for care and services that are furnished to an alien described in paragraph (1) only if—

"(A) such care and services are necessary for the treatment of an emergency medical condition of the alien, and

"(B) such alien otherwise meets the eligibility requirements for medical assistance under the State plan approved under this subchapter (other than the requirement of the receipt of aid or assistance under subchapter IV, supplemental security income benefits under subchapter XVI, or a State supplementary payment).

"(3) For purposes of this subsection, the term 'emergency medical condition' means a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

"(A) placing the patient's health in serious jeopardy,

"(B) serious impairment to bodily functions, or

"(C) serious dysfunction of any bodily organ or part." (42 U.S.C. § 1396b(v).)

Subdivision (a) of the statute provides that aliens are eligible for "Medi-Cal, whether federally funded or state-funded, only to the same extent as permitted under federal law and regulations for receipt of federal financial participation under Title XIX of the Social Security Act, *except as otherwise provided in this section.*" (Italics added.)

Regarding the availability of full-scope benefits, the statute states: "In accordance with . . . the federal Social Security Act (42 U.S.C. § 1396b(v)(1)), and except as otherwise provided in this section, an alien shall only be eligible for the full scope of Medi-Cal benefits, including, but not limited to, renal dialysis and long-term care, if the alien has been lawfully admitted for permanent residence, or is otherwise permanently residing in the United States under color of law." (§ 14007.5, subd (b).)[4]

Restricted benefits which are available to undocumented aliens are covered in subdivision (d) of section 14007.5. Rather than tracking the federal statute completely, subdivision (d) adds a number of qualifications and services to the benefits available to undocumented aliens.[5] Thus, the California statute, unlike the federal provision, offers nonemergency pregnancy-related care as well as continuation inpatient and follow-up outpatient care directly related to emergencies.

---

[4] Section 14007.5, subdivision (b), expressly defines " 'permanently residing in the United State under color of law' " as including: "all aliens residing in the United States with the knowledge and permission of the Immigration and Naturalization Service and whose departure the Immigration and Naturalization Service does not contemplate enforcing and with respect to whom federal financial participation is available under Title XIX of the Social Security Act."

[5] The text of subdivision (d) of section 14007.5, with the portions added by the state legislation underlined, reads as follows:

"(d) Any alien who is otherwise eligible for Medi-Cal services, but who does not meet the requirements under subdivision (b) or (c), shall only be eligible for care and services that are necessary for the treatment of an emergency medical condition of the alien *and for medically necessary pregnancy-related services. For purposes of this section*, the term 'emergency medical condition' means a medical condition manifesting itself by acute symptoms of sufficient severity, including severe pain, *which in* the absence of immediate medical attention could reasonably be expected to result in *any of the following*:

"(1) Placing the patient's health in serious jeopardy.

"(2) Serious impairment to bodily functions.

"(3) Serious dysfunction to any bodily organ or part. *It is the intent of this section to entitle eligible individuals to all inpatient and outpatient services that are necessary for the treatment of an emergency medical condition as certified by the attending physician or other appropriate provider and in the same manner as administered under Section 51056 of Title 22 of the California Code of Regulations. Covered services include continuation of medically necessary inpatient hospital services and follow-up care, as determined by the department, which is directly related to the emergency.*"

*The Emergency Medical Condition Provision*

Petitioner argues that the bone marrow transplant is necessary emergency medical treatment. He relies on the declaration of his treating physician that without further treatment, the cancer cells would again multiply, causing repeated acute episodes which would result in his death within two or three years. The state's argument hinges on the fact that a leukemia patient must be in remission in order to receive a bone marrow transplant, and that that condition, by definition, precludes a finding of an emergency.

■ The starting point of our analysis of this issue must be the language of the statute itself. The language of the federal and state statutes regarding the definition of "emergency medical condition" is nearly identical. The state's argument that there is no emergency once the patient is in remission, although resulting in harsh consequences, has the appeal of a commonsense reading of the statutory language. Even petitioner's physician's declaration, while it emphasizes the need for a bone marrow transplant to cure petitioner's disease, stops short of declaring the procedure to be "necessary for the treatment of an emergency medical condition" as required by the statute. Indeed, a bone marrow transplant can never be an "emergency procedure" as defined by the statute since it can only be performed on a stable patient with no acute symptoms.

Petitioner's argument that the disease of leukemia itself is an emergency condition appeals to basic humanitarian concerns; however, we need not look beyond the language of the statute to determine that a dormant disease state cannot be construed as an emergency under the statutory definition. There simply are no "acute symptoms of sufficient severity . . . which in the absence of immediate medical attention could reasonably be expected to result in . . . [p]lacing the patient's health in serious jeopardy." (§ 14007.5, subd. (d)(1).) Although it may be desirable that the fatal disease of leukemia—which requires achievement of a temporary symptom-free state prior to curative treatment—should be the subject of a special exception to the statute, we cannot read such an exception into the statute when the Legislature has not seen fit to include it.

*Medically Necessary Inpatient Hospital Services—Follow-up Care*

Petitioner argues that even if the bone marrow transplant is not covered as an emergency procedure, it is a covered service under section 14007.5, subdivision (d)(3). That sentence states: "Covered services include continuation of medically necessary inpatient hospital services and follow-up care, as determined by the [State Department of Health Services], which is direct-

ly related to the emergency." This language is not included in the federal statute but was added by the California Legislature in 1988.

■■■ The legislation enacted in 1988, known as Senate Bill No. 175, contains uncodified findings regarding the intent of the Legislature.[6] Thus, section 1, subdivision (a) of S.B. 175 provides that prior state law extended benefits only to aliens who were lawful permanent residents or under-color-of-law residents. (See Historical Note, 74 West's Ann. Welf. & Inst. Code (1990 cum. pocket supp.) § 11104.1, p. 44.) Section 1(c) of S.B. 175 provides: "OBRA [the Omnibus Budget Reconciliation Act of 1986] allows Medi-Cal coverage of undocumented aliens who are otherwise eligible for Medi-Cal. It provides federal financial participation in the costs of emergency medical care provided to such aliens. Adoption of enabling state legislation to implement OBRA in California is necessary to maximize the amount of federal financial participation available to the state, and to authorize Medi-Cal reimbursement to county hospitals, emergency clinics, trauma centers, and other providers who currently render unfunded emergency care to undocumented aliens." This provision evidences an intent to obtain the maximum available federal participation in California's medical benefits program. It does not, however, expressly indicate an intent to restrict state services independent of federal participation.[7]

The state highlights the following language in section 1(f) of S.B. 175 to illustrate its position that no additional state benefits were intended: "All aliens otherwise eligible for Medi-Cal program services shall be eligible only for the scope of services their specific alien status entitles them to under federal law." Because the federal law covers only emergency services, argues the state, the additional language in the state statute cannot be read to "create a separate category of extremely expensive services with virtually no limits." Petitioner argues that the additional language of the statute must mean something, and that the meaning should be interpreted to include a bone marrow transplant as a continuation of the emergency services provided in connection with the acute onset of petitioner's disease.

---

[6](Sen. Bill No. 175 (1987-1988 Reg. Sess.) was enacted on Sept. 27, 1988; Stats. 1988, ch. 1441 [hereafter S.B. 175].)

[7]The introductory language evidences an intent to maximize the amount of federal financial participation available to the state by incorporating emergency services in the state coverage and directing state officials to develop policies to ensure that needy aliens "shall be considered 'permanently residing under color of law' for the purpose of determining their eligibility for Medi-Cal." (74 West's Ann. Welf. & Inst. Code, *op. cit. supra,* at p. 44.) This concern with obtaining all possible federal compensation for uncompensated state health care providers does not rule out the possibility of authorizing additional state paid services. It is undisputed that the Legislature may authorize broader health care services than those authorized by federal law. (*Dermegerdich* v. *Rank, supra,* 151 Cal.App.3d 848.)

Because the language of the uncodified portion of S.B. 175 at least arguably creates a conflict with the additional language of section 14007.5, and because even the codified portions are susceptible to more than one construction, we turn to an examination of the legislative history. (*Reyna* v. *McMahon* (1986) 180 Cal.App.3d 220, 225 [225 Cal.Rptr. 405].) An earlier version of the 1988 legislation expressly stated that " 'emergency medical condition' shall have the same meaning as that given to the term in Section 1903(v)(3) of the federal Social Security Act." (Assem. Amend. to S.B. 175 (1987-1988 Reg. Sess.) Mar. 21, 1988.) The last sentence of subdivision (d)(3) of section 14007.5 stated: "It is the intent of this section to entitle eligible individuals to all hospital medical and surgical services and other services provided due to an emergency medical condition to the fullest extent to which federal financial participation is authorized by federal law." This version of the bill also contained the (subsequently uncodified) language regarding aliens being eligible only for the scope of services available under federal law. Although the Legislature deleted the language restricting emergency medical treatment, it left intact the initial language of intent. If the Legislature intended to restrict the scope of the statute solely to the federal standard, it would not have removed the language that clearly accomplished that result. We decline to construe the legislation to include a provision that was omitted from the final version of the bill. (*Madrid* v. *Justice Court* (1975) 52 Cal.App.3d 819, 825 [125 Cal.Rptr. 348].)

Examining other language of section 14007.5, it is clear that the Legislature contemplated that federal financial participation would not be available for some services authorized by the statute. Thus, the California statute provides for pregnancy-related services for undocumented aliens while federal law covers only emergency labor and delivery. (Compare § 14007.5, subd. (d), with 42 U.S.C. § 1396b(v)(3).) In addition, the language of the introductory paragraph of section 14007.5 provides: "Aliens shall be eligible for Medi-Cal, whether federally funded *or state-funded*, only to the same extent as permitted under federal law . . . *except as otherwise provided in this section.*" (§ 14007.5, subd. (a) italics added.) These factors indicate an intent to provide more or different coverage than the federal statute.

Petitioner's construction of section 14007.5 does not conflict with the introductory language of S.B. 175. When the initial statement is read with the added language of section 14007.5, it appears that the end product of the legislative process provides that aliens are eligible for federal- or state-funded services to the extent that federal financial participation is available, except as otherwise provided in the statute. Subdivision (d) of section 14007.5 has "otherwise provided" (by adding language that does not exist in the federal statute) that undocumented aliens are also eligible for continuation of medically necessary inpatient services and follow-up care.

The state argues that unless this provision is construed to "relate back" to the services that were necessary to treat the emergency, the differences between full-scope and restricted benefits will be eliminated. The state claims that under petitioner's construction, so long as a service can be related to an underlying condition that was once an emergency the service would have to be covered. Use of the words "continuation" and "follow-up" indicates an intent to refer to something closely following the emergency, rather than something included within it. To conclude otherwise, we would have to read out those words in the statute. We cannot adopt the state's position that the Legislature intended to authorize only those services authorized by the Medicaid program. We conclude, therefore, that the reference to continuation and follow-up care relates to events occurring after the emergency event has taken place, and pertains to services potentially not covered by the federal statute.

*Scope of Other Covered Services*

▮ Deciding that the continuation and follow-up services provisions are intended to include services other than federally authorized emergency services does not end our inquiry. The issue remains of what services constitute "continuation of medically necessary inpatient hospital services and follow-up care, as determined by the department, which is directly related to the emergency." The chapter of the statutory scheme that contains section 14007.5 also contains a definition of the term "medically necessary." Thus, "[a] service is 'medically necessary' or a 'medical necessity' when it is reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain." (§ 14059.5.)

The state argues that the medical necessity standard is limited by the emergency context of section 14007.5, and we agree. It further argues, citing *Cowan* v. *Myers* (1986) 187 Cal.App.3d 968, 976 [232 Cal.Rptr. 299], that the individual physician alone is not the sole source of what constitutes a medical necessity. The court in *Cowan* was considering whether the statutory definition of "medically necessary" conflicted with the requirements of the federal Medicaid Act. In this context, the court stated that the Legislature makes a macro-decision as to what services come under coverage of the state plan, while the physician makes a micro-decision that the patient's condition requires that service. However, we have already determined that the Legislature here made the macro-decision that care would continue after the emergency event took place. In light of the statutory definition of "medical necessity" as a service necessary to protect life and prevent significant illness, we do not detect a legislative limitation on the provision of a bone marrow transplant. There has been no opposition to petitioner's physician's opinion that petitioner would die without the procedure.

We find no indication that the Legislature intended section 14007.5 to be construed to deny a life-saving treatment to a patient who initially seeks treatment for emergency symptoms of a fatal disease. This conclusion is particularly compelling under the circumstances of this case, where the nature of the disease requires the temporary inducement of a state of remission in order to perform the needed procedure. We conclude that the "medical necessity" standard and the "directly related to the emergency" language of section 14007.5, subdivision (d), provides an appropriate and ascertainable limit on the type of continuation and follow-up service contemplated by the statute. Based upon the facts presented in the instant case, and the lack of a factual dispute over the necessity of the procedure to save petitioner's life, we find that the bone marrow transplant was a "continuation of medically necessary inpatient hospital services . . . directly related to the emergency."[8]

## DISPOSITION

Since the state authorized the bone marrow transplant and petitioner received the treatment over four months ago, the alternative writ of mandate is discharged and the peremptory writ is denied.

Racanelli, P. J., and Newsom, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied March 28, 1991. Lucas, C. J., Panelli, J., and Baxter, J., were of the opinion that the petition should be granted.

---

[8] Although we omitted the words "as determined by the department" from the above quote, we do not find the result in this case to be affected by any determination made by the department. Clearly, the emergency state here involved is a patient admitted to the hospital with acute symptoms which are diagnosed as being caused by a fatal disease. Once this determination is made, the patient is entitled to emergency services, as well as the continuation and follow-up services found to be medically necessary and directly related to the emergency. The state's position throughout this case has been that *no* services are covered once a state of remission is reached. At no time has the state argued that the bone marrow transplant was not medically necessary to save petitioner's life.

To the extent that the state has argued that it determined the procedure was not directly related to the emergency event, there is no evidence of that determination. The state's expert witness merely stated that the bone marrow transplant was never an emergency procedure. Petitioner's physician's declaration stated that the transplant was a continuation of his treatment of the disease that caused the emergency symptoms. This undisputed statement establishes the procedure as a "continuation" of the emergency treatment.