## ZBIGNIEW SZEWCZYK *v.* DEPARTMENT OF SOCIAL SERVICES
### (AC 22134)

Lavery, C. J., and Bishop and Stoughton, Js.

Argued November 20, 2002—officially released May 27, 2003

*Thomas J. Riley*, with whom was *Shawn L. Rutchick*, for the appellant (plaintiff).

*Tanya Feliciano*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Richard J. Lynch*, assistant attorney general, for the appellee (defendant).

*Opinion*

BISHOP, J. This appeal presents the question of whether hospital in-patient chemotherapy treatment of an undocumented alien who has been diagnosed with acute myelogenous leukemia constitutes treatment for an emergency medical condition so as to entitle the hospital to receive medicaid reimbursement for the cost of the treatment. Having provided treatment to the plaintiff, an undocumented alien, the hospital sought medicaid reimbursement from the department of social services (department).[1] Once the department rejected the plaintiff's reimbursement request, the plaintiff sought judicial review in the trial court where his appeal was dismissed. The two issues on appeal are (1) whether the court applied the proper legal standard for determining whether the plaintiff suffered from an "emergency medical condition" so as to qualify for medicaid benefits and (2) whether the court's conclusion that the plaintiff did not have an "emergency condition" was supported by substantial evidence. We affirm the judgment of the trial court.

To address the issues on appeal adequately, it is appropriate to provide a brief overview of the medicaid

---

[1] Pursuant to assignment, the application for reimbursement and subsequent appeal to the trial court were brought in the plaintiff's name although it would appear, as a practical matter, that the treating hospital is the real party in interest.

program as it relates to undocumented aliens.[2] "Medicaid is a federal program that provides health care funding for needy persons through cost-sharing with states electing to participate in the program." *Greenery Rehabilitation Group, Inc.* v. *Hammon*, 150 F.3d 226, 227 (2d Cir. 1998). States, such as Connecticut, that elect to participate in the medicaid program are required to follow federal requirements. See *Clark* v. *Commissioner of Income Maintenance*, 209 Conn. 390, 394, 551 A.2d 729 (1988). The medicaid program is administered in Connecticut by the department pursuant to General Statutes § 17b-260. The department's uniform policy manual (manual) sets forth the regulations in regard to medicaid, and has the full force and effect of law pursuant to General Statutes § 17b-10.

The department's regulations of the eligibility of undocumented aliens for medicaid assistance mirror its federal counterpart, which provides that "[u]ndocumented aliens or aliens not otherwise permanently residing in the United States under color of law generally are not entitled to full medicaid coverage. See 42 U.S.C. § 1396b (v) (1) ('no payment may be made to a State under this section for medical assistance furnished to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law'); 42 C.F.R. § 435.406. The only exception to this exclusion is payment for medical assistance that is 'necessary for the treatment of an emergency medical condition.' 42 U.S.C. § 1396b (v) (2) (A)." *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 150 F.3d 227–28.

Under federal law, an "emergency" is defined as "a medical condition (including emergency labor and

---

[2] Undocumented aliens are those who are not permanent residents or "otherwise permanently residing in the United States under color of law . . . ." 38 Fed. Reg. 30,259 (November 2, 1973).

delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(A) placing the patient's health in serious jeopardy, (B) serious impairment to bodily functions, or (C) serious dysfunction of any bodily organ or part." 42 U.S.C. § 1396b (v) (3).

"The corresponding regulation . . . found at 42 C.F.R. § 440.255 (b) (1) . . . provides that aliens are entitled to Medicaid coverage for [e]mergency services required after the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in: (i) Placing the patient's health in serious jeopardy; (ii) Serious impairment to bodily functions; or (iii) Serious dysfunction of any bodily organ or part." *Greenery Rehabilitation Group, Inc.* v. *Hammon,* supra, 150 F.3d 227.

In Connecticut, consistent with the federal requirements, undocumented aliens are ineligible for medicaid coverage unless they have an emergency medical condition and are otherwise eligible for medicaid. See Department of Social Services, Uniform Policy Manual § 3005.05C. "A medical condition is considered an emergency when it is of such severity that the absence of immediate medical attention could result in placing the patient's health in serious jeopardy. This includes emergency labor and delivery, and emergencies related to pregnancy, but does not include care or services related to an organ transplant procedure." Id., § 3000.01.[3]

---

[3] We note that part II of the dissent consists of an argument that the provision of emergency medical care under medicaid for undocumented aliens in Connecticut is more generous than that required by the federal medicaid statute and its correlative regulations. The dissent bases that conclusion on the absence of the term "acute" from the Connecticut regulation and its presence in the federal counterpart regulation, asserting that this difference in language supports the notion that Connecticut has adopted a less restrictive medicaid provision than exists in federal law. Other than a

Keeping the foregoing background in mind, we now turn to the facts and procedural history that are relevant to the plaintiff's claims. The plaintiff, a citizen of Poland, came to the United States on a tourist visa and remained illegally after his visa expired. On or about November 15, 1998, he began having symptoms relating to his current medical condition.

On November 19, 1998, he reported to his family physician that he was experiencing stomach pain, nausea and was having trouble walking. That same day, the plaintiff underwent blood tests and X rays. The test results became available on November 24, 1998, and on the basis of those results, his family physician referred him to Robert B. Erichson, an oncologist at Stamford Hospital (hospital).

Under the care of Erichson, on November 24, 1998, the plaintiff was diagnosed as having acute myelogenous leukemia, a disease that can be fatal if not treated aggressively with chemotherapy. As a result of the diagnosis, Erichson performed bone marrow biopsies and inserted a triple lumen Hickman catheter into the plaintiff so as to begin chemotherapy treatment. Following a course of chemotherapy, the plaintiff was discharged on December 26, 1998.

On February 26, 1999, the hospital filed an application for medicaid on behalf of the plaintiff. In its application, the hospital indicated that it was seeking payment for

general discussion concerning an approach to legislative history, the dissent has not cited any portion of the legislative record to support its conclusion that the General Assembly intended for Connecticut citizens to be required to pay, without federal reimbursement, more for emergency medical care to undocumented aliens than that which is mandated by medicaid. Additionally, although the appellant notes the language of Connecticut's pertinent regulation, he has provided no analysis or argument that Connecticut's scheme is anything other than a mirror of its federal counterpart. Because the appellant did not brief the question of whether Connecticut's medicaid scheme relating to undocumented aliens differs from its federal counterpart, we do not believe that claim is appropriate for separate analysis.

in-patient hospital care that the plaintiff had received that was "necessary for the treatment of his emergency medical condition" and which resulted in his hospitalization from November 24 to December 26, 1998. The plaintiff's application was sent for review to a third party, Colonial Cooperative Care, Inc. (Colonial), and to the department's medical review team (review team).

On April 24, 1999, Colonial found that the plaintiff met the criteria for disability as set forth in the department's regulations. Notwithstanding Colonial's findings, the review team found on May 11, 1999, that the plaintiff did not meet the criteria for having an emergency medical condition, and on May 17, 1999, the department denied the plaintiff's application for emergency medical assistance under medicaid.[4]

Subsequently, the plaintiff requested an administrative hearing to review the denial of his application for Medicaid assistance. A hearing was held on November 19, 1999, in which a department hearing officer adopted the review team's determination that the plaintiff did not have an "emergency medical condition" at the time he was admitted at the hospital on November 24, 1998. The hearing officer's conclusion was based, inter alia, on his findings that the medical procedures, bone marrow biopsies and the insertion of a Hickman catheter, performed at the hospital during the plaintiff's hospitalization, were not emergency medical events. Furthermore, the officer noted that the plaintiff would not have died if he did not receive treatment the day he was admitted. As a result, the plaintiff filed an administrative appeal with the Superior Court, which in turn was dismissed. This appeal followed. Additional facts will be set forth as necessary.

[4] There is no dispute between the parties that but for the plaintiff's status as an undocumented alien, he would have been eligible for medicaid assistance.

## I

The first issue on appeal is whether the court applied the proper legal standard for determining whether the plaintiff suffered from an "emergency medical condition" so as to qualify him for medicaid benefits. Specifically, the plaintiff contends that the hearing officer construed the definition of "emergency medical condition" under § 3000.01 of the manual too narrowly by requiring the plaintiff to show that he "would . . . have immediately died on November 24, 1998 [date of admittance] if he had not received the treatment administered to him on that date at Stamford Hospital." We disagree.

Before turning to the merits of the plaintiff's claim, we set forth our standard of review. "Judicial review of the conclusions of law reached administratively is . . . limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of [the Supreme Court] to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Citations omitted; internal quotation marks omitted.) *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection,* 253 Conn. 661, 669, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001).

In its definition of "emergency condition," § 3000.01 of the manual mirrors its federal counterpart, 42 U.S.C. § 1396b (v) (3). As stated previously, the manual provides that "[a] medical condition is considered an emer-

gency when it is of such severity that the absence of immediate medical attention could result in placing the patient's health in serious jeopardy. . . ." Uniform Policy Manual, supra, § 3000.01. Although § 3000.01 of the manual mirrors its federal counterpart, those regulations do not make plain the circumstances in which a serious medical condition may be considered to be an "emergency." We have held that "[w]here the words of a statute fail to indicate clearly whether the provision applies in certain circumstances, it must be construed by this court . . . . Our objective in construing the language of an ambiguous statute is to give effect to the apparent intent of the legislature. . . . In our pursuit of that objective, we look to the language of the statute itself, its legislative history, and previous judicial construction." (Citations omitted; internal quotation marks omitted.) *Roach* v. *Roach*, 20 Conn. App. 500, 511, 568 A.2d 1037 (1990); see also *State* v. *Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003) (en banc).

In accordance with those principles of statutory construction, we look to the language of the statute itself, its legislative history and previous judicial construction in determining what elements will constitute an "emergency medical condition" under § 3000.01 of the manual. In pursuing our objective, we are informed by the approach taken by the United States Court of Appeals for the Second Circuit as to the scope and nature of 42 U.S.C. 1396b (v) (3), which § 3000.01 of the manual mirrors. See *Lewis* v. *Thompson*, 252 F.3d 567 (2d Cir. 2001); *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 150 F.3d 226.

In *Lewis* v. *Thompson*, supra, 252 F.3d 570–79, the Second Circuit provided a comprehensive legislative history of medicaid coverage for illegal aliens. The court noted that the clear purpose of the medicaid statute since its inception in 1965 is to make government more cost-effective. The court opined that in keeping with

that purpose, Congress amended the medicaid statute in 1986 to bar aid to "non-PRUCOL aliens"[5] for any condition short of a medical emergency. Id., 573–74; see also Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, 100 Stat. 1874, 2057 (1986). The Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, §§ 400-51, 110 Stat. 2105, 2261-76 (codified as amended at 8 U.S.C. §§ 1601-46 [2001]) (PRWORA) expanded the class of aliens who were ineligible for Medicaid, except for emergency care, to include some PRUCOL aliens.[6] *Lewis* v. *Thompson*, supra, 577–78. On the basis of its review of the legislative history, the court concluded that Congress intended that the "emergency medical condition" exception under PRWORA should be narrowly construed. Id., 580–81. The court stated that "[i]n discussing the alienage restrictions in the bill, the House Conference Report emphasizes: The allowance for emergency medical services under Medicaid is very narrow. The conferees intend that it only apply to medical care that is strictly of an emergency nature, such as medical treatment administered in an emergency room, critical care unit, or intensive care unit. *The conferees do not intend that emergency medical services include pre-natal or delivery care assistance that is not strictly of an emergency nature as specified herein.* H.R. Conf. Rep. No. 104-725, at 380 (1996) . . . *reprinted in* 1996 U.S.C.C.A.N. 2649, 2768." (Emphasis in original.) *Lewis* v. *Thompson*, supra, 578.

As to the parameters of an "emergency condition" under PRWORA, we find the Second Circuit's reasoning

[5] See footnote 2. "Non-PRUCOL aliens" refers to aliens who are not permanently residing under color of law. The Second Circuit discussed the derivation of that doctrine from 45 C.F.R. § 233.50 and its application in *Holley* v. *Lavine*, 553 F.2d 845, 848–51 (2d Cir. 1977), cert. denied sub nom. *Shang* v. *Holley*, 435 U.S. 947, 98 S. Ct. 1532, 55 L. Ed. 2d 545 (1978).

[6] Section 401 (a) of PRWORA makes clear that a nonqualified alien is not eligible for any federal public benefit unless he meets one of the exceptions in 8 U.S.C. § 1611 (b).

in *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 150 F.3d 226, instructive. The Greenery Rehabilitation Group, Inc., (Greenery Rehabilitation) had operated nursing homes and rehabilitation facilities that provided specialized programs for the care of individuals who have suffered brain injuries. Greenery Rehabilitation entered into an agreement with the New York City human resources administration to provide care for New York City residents who were in need of its services and who were eligible for medicaid. Id., 228. In line with that agreement, Greenery Rehabilitation admitted into its facilities three patients who had suffered sudden and serious head injuries that necessitated immediate treatment, which left the patients with long-term debilitating conditions that required ongoing daily care. Id. It did so under the belief that medicaid would cover the services provided to the patients. Id.

The court in *Greenery Rehabilitation Group, Inc.*, reasoned that because the patients' initial injuries had been treated and the patients were stabilized prior to being moved to the Greenery Rehabilitation facilities, their medical conditions no longer could be classified as "emergencies." Id., 232–33. Instead, the patients suffered from chronic conditions requiring daily and regimented care. Id. As a result, Greenery Rehabilitation could not receive reimbursement for providing ongoing daily care to the patients, despite the fact that those patients' conditions upon admission had been "emergencies," and even though the discontinuance of their ongoing care could have had grave consequences for them. Id. Moreover, the court elaborated that a medical condition does not become an "emergency" under the statute simply because the discontinuance of care may place the patient's life at risk. Id., 232.

In arriving at its conclusion that the patients' conditions were "chronic" as opposed to "emergencies," the Second Circuit in *Greenery Rehabilitation Group, Inc.*,

reasoned that "[i]n the medical context, an emergency is generally defined as a sudden bodily alteration such as is likely to require immediate medical attention. . . . The emphasis is on *severity, temporality* and *urgency.* We believe that 42 U.S.C. § 1396b (v) (3) clearly conveys this commonly understood definition.

"An acute symptom is a symptom characterized by sharpness or severity . . . having a sudden onset, sharp rise, and short course . . . [as] opposed to *chronic.* . . . Moreover, as a verb, manifest means to show plainly. . . . In [42 U.S.C.] § 1396b (v) (3) this verb is used in the present progressive tense to explain that the emergency medical condition must be revealing itself through acute symptoms. Thus . . . the statute plainly requires that the acute indications of injury or illness must coincide in time with the emergency medical condition. Finally, immediate medical care means medical care occurring . . . without loss of time or that is not secondary or remote. . . . In sum, the statutory language unambiguously conveys the meaning that emergency medical conditions are sudden, severe and short-lived physical injuries or illnesses that require immediate treatment to prevent further harm." (Citations omitted; emphasis altered; internal quotation marks omitted.) *Greenery Rehabilitation Group, Inc.* v. *Hammon,* supra, 150 F.3d 232.

We conclude, on the basis of the language of the statute itself, its legislative history and previous judicial construction of it, that the hearing officer did not use a legal standard that was "too narrow" in arriving at the conclusion that the plaintiff did not have an "emergency medical condition" as defined by § 3000.01 of the manual. The hearing officer's determinations were consonant with the Second Circuit's admonition that in determining whether a medical condition is an "emergency" for purposes of PRWORA, which § 3000.01 of the manual mirrors, the legal standard employed by the

hearing officer must emphasize the *severity, temporality and urgency* of the medical condition.

In making his determination, the hearing officer considered the *severity, temporality and urgency* of the plaintiff's medical condition. In terms of the immediacy of the plaintiff's medical treatment, the hearing officer found that the plaintiff "would not have immediately died on November 24, 1998, if he had not received the treatment administered to him on that date at Stamford Hospital." As well, the hearing officer also considered the nature of the treatment received by the plaintiff in concluding that "[b]one marrow biopsies and the insertion of a triple lumen Hickman catheter are not emergency events." Last, the hearing officer considered the severity of the condition by noting that the plaintiff "was diagnosed with acute myelogenous leukemia and was admitted to Stamford Hospital, where he underwent certain medical procedures. Although these procedures were necessary to begin [the plaintiff's] chemotherapy, there is no indication that they were of an emergency nature; i.e., that the [plaintiff's] health would have been in serious jeopardy had they not begun on November 24, 1998 . . . ."

As our Supreme Court has stated, "[w]e are not without sympathy for those with minimal resources for medical care. But our sympathy is an insufficient basis for approving a recovery based on a theory inconsistent with law." (Internal quotation marks omitted.) *Clark v. Commissioner of Income Maintenance*, supra, 209 Conn. 406. Accordingly, the conclusion of law reached by the hearing officer must stand because it resulted from a correct application of the law to the facts found and reasonably and logically could follow from such facts.

## II

We next turn to the plaintiff's claim that there was not substantial evidence to support the court's decision

that the plaintiff did not have an "emergency medical condition." We disagree.

Before addressing the merits of the plaintiff's claim, we set forth our standard of review. "Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action." (Internal quotation marks omitted.) *Williams* v. *Commission on Human Rights & Opportunities*, 67 Conn. App. 316, 323–24, 786 A.2d 1283 (2001).

As discussed in part I, in *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 150 F.3d 232, the court defined emergency medical conditions as "sudden, severe and short-lived physical injuries or illnesses that require immediate treatment to prevent further harm." In deciding what constitutes a "medical emergency," the emphasis is on *severity, temporality* and *urgency.* Id.

In terms of the severity of the plaintiff's condition, the hearing officer found that the plaintiff "was diagnosed with acute myelogenous leukemia and was admitted to Stamford Hospital, where he underwent certain medical procedures [bone marrow biopsies and the insertion of a triple lumen Hickman catheter]. The hear-

ing officer further found that "[a]lthough these procedures were necessary to begin [the plaintiff's] chemotherapy, there is no indication that they were of an emergency nature; i.e., that the [plaintiff's] health would have been in serious jeopardy had they not begun on November 24, 1998 . . . ."

As to the urgent need for the treatment received by the plaintiff, we note that "immediate medical care means medical care occurring . . . without loss of time or that is not secondary or remote." (Internal quotation marks omitted.) Id. On the basis of our review of the record, we conclude that there was substantial evidence in the record for the court to determine that the plaintiff's medical condition was not immediate or urgent. More precisely, the court noted that "[t]he administrative record indicates that the plaintiff appeared in the emergency room two weeks after he suffered his initial symptoms." Furthermore, the plaintiff reported weight loss a few months prior to his hospitalization.

The record does not reveal that the plaintiff's health would have been in serious jeopardy if he had been admitted for treatment one week later or at some time thereafter. As the court noted in its memorandum of decision, the "plaintiff received the beginning treatments in the hospital for a medical condition that is only cured over the long term, and he was essentially admitted to begin a course of chemotherapy. . . . It is true that when he decided to go to the emergency room, the plaintiff's condition had reached a crisis stage . . . but the record also contains notes of health professionals showing that the plaintiff was not in need of urgent care on November 24 [1998]. . . . (The plaintiff denied fever, chills, cough, gum bleeding or excessive bruising . . . The notes indicate his pallor as very pale, but his vital signs are listed as normal) . . . ."

We are not persuaded by the plaintiff's argument that the hearing officer should have adopted the opinion of the plaintiff's treating physician, Erichson, who concluded that the plaintiff suffered from an "emergency condition" within the definition in § 3000.01 of the manual. We similarly are not persuaded by the plaintiff's argument that the hearing officer should have accorded more weight to other evidence besides the review team's report, which concluded that the plaintiff did not suffer from an "emergency medical condition." As we consistently have held, "[t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency, and, if there is evidence [as is the case here] . . . which reasonably supports the decision of the [hearing officer], we cannot disturb the conclusion reached . . . ." (Internal quotation marks omitted.) *Elf* v. *Dept. of Public Health*, 66 Conn. App. 410, 422, 784 A.2d 979 (2001).

Since there was substantial evidence in the administrative record to support the agency's findings of basic fact and its conclusion that the plaintiff did not have an "emergency medical condition" when he received treatment at the hospital, the court did not improperly dismiss the plaintiff's appeal.

The judgment is affirmed.

In this opinion STOUGHTON, J., concurred.

LAVERY, C. J., dissenting. I respectfully disagree with the majority's conclusion that the plaintiff, Zbigniew Szewczyk, did not suffer from an emergency medical condition under the definition set forth in either the federal statute, 42 U.S.C. § 1396b (v) (3), or the state regulation, § 3000.01 of the Uniform Policy Manual of the defendant department of social services (department), and was, therefore, not entitled to receive benefits. Accordingly, I would reverse the judgment and

direct the trial court to remand the matter to the department to grant the plaintiff's application for benefits.

The underlying facts of this case are not in material dispute. The plaintiff, a native of Poland, illegally remained in this country after his visa expired. On November 24, 1998, the plaintiff sought treatment from his family physician. At that time, he suffered from intense pain, nausea and overall weakness so severe that he could take only one to two steps before collapsing. After reviewing the results of tests performed on the plaintiff's blood samples, the plaintiff's physician immediately referred the plaintiff to Robert B. Erichson, an oncologist at Stamford Hospital (hospital).

On that same day, Erichson diagnosed the plaintiff with acute myelogenous leukemia and admitted him to the hospital. The plaintiff received treatment consisting of chemotherapy, surgery and biopsies at the hospital until his discharge on December 26, 1998. The hospital charges from November 24 through December 26, 1998, totaled $82,046.85.[1]

An application for benefits from November through December, 1998, was filed with the defendant, an agency of the state. Erichson wrote a letter, which was admitted into evidence by the department's hearing officer, that stated that "acute myelogenous leukemia . . . *is a rapidly fatal disease unless treated aggressively with chemotherapy.*" (Emphasis added.) Erichson also opined that such chemotherapy is always administered in a hospital, associated with severe infections requiring aggressive antibiotic and transfusion treatment, and that *"in the absence of such therapy, [the plaintiff] would probably not be alive today."*[2] (Emphasis added.)

[1] If the department's hearing officer had determined that the plaintiff had been eligible for the benefits he attempted to obtain, the state would have been required to contribute $22,386.56.

[2] The complete text of the Erichson letter states: "Regarding [the plaintiff] and his admission of 11/27/98 to 12/26/98. [The plaintiff] has acute myelogenous leukemia which is a rapidly fatal disease unless treated aggressively

Despite the absence of any medical evidence to the contrary, the hearing officer determined that the plaintiff did not suffer from an emergency medical condition and therefore was not eligible for benefits. Specifically, the hearing officer found that the plaintiff did not suffer from an emergency medical condition because the plaintiff would not have immediately died on November 24, 1998, if he had not received treatment.

The plaintiff appealed to the trial court from the denial of benefits. The court held that the officer had applied the proper legal standard and that substantial evidence existed in the record to support the officer's conclusion, which the majority affirms today.

At the outset, it is important to identify precisely the party and the specific regulations that the plaintiff is challenging. Although medicaid[3] is a joint program between the federal government and the states that elect to participate, and states that participate must follow the requirements mandated by the federal government; *Greenery Rehabilitation Group, Inc.* v. *Hammon*, 150 F.3d 226, 227 (2d Cir. 1998); the defendant, a state agency, administers the program in Connecticut.[4]

---

with chemotherapy. Such chemotherapy is always administered in the hospital and is almost always associated with severe infections, requiring aggressive antibiotic therapy, as well as an aggressive transfusion program, including packed cells and platelets. The duration of his hospitalization is standard for such therapy and, in the absence of such therapy, [the plaintiff] would probably not be alive today [June 7, 1999]." The date of admission appears to be in error in the letter, as all of the other evidence indicates that the plaintiff was admitted to the hospital on November 24, 1998.

[3] "Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396s, commonly known as the Medicaid Act, is a federal-state cooperative program designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of medical care." *Weaver* v. *Reagen*, 886 F.2d 194, 197 (8th Cir. 1989).

[4] General Statutes § 17b-260 provides: "The Commissioner of Social Services is authorized to take advantage of the medical assistance programs provided in Title XIX, entitled 'Grants to States for Medical Assistance Programs', contained in the Social Security Amendments of 1965 and *may administer the same in accordance with the requirements provided therein,* including the waiving, with respect to the amount paid for medical care, of

I believe that the plaintiff suffered from an emergency medical condition and was therefore entitled to medicaid benefits under the definition set forth by the federal statute or by the state regulation.

## I

The defendant is required, due to this state's participation in medicaid, to provide payment for medical treatment to those persons who are determined to be eligible under federal law. Under federal law, payment of federal funds generally is prohibited for medical services provided to unlawful aliens such as the plaintiff. 42 U.S.C. § 1396b (v) (1). Congress, however, has authorized payment for medical treatment provided to unlawful aliens if that treatment is for an emergency medical condition. 42 U.S.C. § 1396b (v) (2) (A). An emergency medical condition is defined as "a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(A) placing the patient's health in serious jeopardy, (B) serious impairment to bodily functions, or (C) serious dysfunction of any bodily organ or part." 42 U.S.C. § 1396b (v) (3).[5]

The United States Court of Appeals for the Second Circuit extensively discussed the meaning of "emergency medical condition" in *Greenery Rehabilitation*

provisions concerning recovery from beneficiaries or their estates, charges and recoveries against legally liable relatives, and liens against property of beneficiaries." (Emphasis added.)

[5] The corresponding federal regulation provides: "Emergency services required after the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in: (i) Placing the patient's health in serious jeopardy; (ii) Serious impairment to bodily functions; or (iii) Serious dysfunction of any bodily organ or part." 42 C.F.R. § 440.255 (b) (1).

*Group, Inc.* v. *Hammon,* supra, 150 F.3d 226. In that case, "three patients, [all who failed to meet the residency requirements to be eligible for medicaid benefits] suffered sudden and serious head injuries that necessitated immediate treatment and *ultimately left the patients with long-term debilitating conditions requiring ongoing care and daily attention.*"[6] (Emphasis added.) Id., 228. The District Court, having found that the three patients had received treatment and had been stabilized prior to being moved to the plaintiff's facility, concluded that two of the patients were receiving emergency medical care and, therefore, the plaintiff was entitled to reimbursement for providing medical services. Id., 230–31.

The Second Circuit, contrary to the result reached by the District Court, agreed with the defendants that emergency medical care does not include "a condition requiring daily and regimented care for chronic conditions . . . ." Id., 232. Instead, in the context of a medical condition, the term "emergency" is defined by focusing on severity, temporality and urgency. Id. "In sum, *the statutory language unambiguously conveys the meaning that emergency medical conditions are sudden, severe and short-lived physical injuries or*

---

[6] The first patient, Izeta Ugljanin, suffered severe head and brain injuries as a result of being thrown from a motor vehicle during an automobile accident. After being stabilized, she was transferred to the plaintiff facility, a rehabilitation center, where she required a feeding tube, continual monitoring and nursing care as a result of her condition as a quadriplegic. *Greenery Rehabilitation Group, Inc.* v. *Hammon,* supra, 150 F.3d 228.

The second patient, Leon Casimir, suffered brain damage as a result of a gunshot wound to the head. After he was stabilized, he was transferred to the plaintiff facility, where he remained unable to walk, required monitoring and medication for the treatment of seizures and behavioral problems, and required assistance with daily tasks, such as bathing, dressing and eating. Id., 228–29.

The third patient, Yik Kan, suffered from behavioral and psychiatric problems that required medication and monitoring after being attacked and beaten. He also became legally blind as a result of the attack. Id., 229.

*illnesses that require immediate treatment to prevent further harm.*" (Emphasis added.) Id.

At the outset, I note my agreement with the majority that *Greenery Rehabilitation Group, Inc.*, sets forth the appropriate standard, under federal law, for determining whether an otherwise ineligible alien is entitled to medicaid coverage for an emergency medical condition. My disagreement stems from the application of that standard to the facts of the present case. I believe that the present case is factually distinguishable from *Greenery Rehabilitation Group, Inc.*, and, moreover, that the majority interprets the test to determine what qualifies as an emergency medical condition, as set forth in *Greenery Rehabilitation Group, Inc.*, too narrowly.

The facts presented in *Greenery Rehabilitation Group, Inc.*, concerned the issue of long-term medical care provided after a patient already had been stabilized. The period of treatment for stabilization of the patient was not, therefore, an issue in *Greenery Rehabilitation Group, Inc.* The three patients in *Greenery Rehabilitation Group, Inc.*, suffered from chronic, debilitating conditions and required daily monitoring without a significant prognosis for improvement. The Second Circuit premised much of its opinion on the fact that the patients in *Greenery Rehabilitation Group, Inc.*, required "daily and regimented" custodial care. Id. Two of the treating physicians testified[7] that the patients were receiving chronic, as opposed to emergency, care. Id. Furthermore, the court acknowledged that the

---

[7] "[Michael] Randon [a treating physician] testified that [the first of the three patients, Izeta] Ugljanin was receiving 'chronic skill care' from [the Greenery Rehabilitation Group, Inc.] as opposed to what is commonly understood to be emergency medical care.

"[John] Berry [a treating physician] testified that . . . [the second and third patients, Leon Casimir and Yik Kan] had suffered no 'physical emergencies' while at [the Greenery Rehabilitation Group, Inc.] and that they were receiving chronic rather than emergency care." *Greenery Rehabilitation Group, Inc.* v. *Hammon, supra,* 150 F.3d 232.

patient's initial injuries "undoubtedly satisfied the plain meaning of [42 U.S.C.] § 1396b (v) (3)." *Greenery Rehabilitation Group, Inc.* v. *Harmon,* supra, 150 F.3d 232. It was only after they were stabilized and moved to the long-term care facility where the further direct harm from those injuries was removed that the emergency condition ended.

The Second Circuit concluded by establishing the standard for determining an emergency medical condition under the federal statute. "An 'emergency medical condition' must be manifested by acute, rather than chronic symptoms. *It must necessitate immediate medical treatment, without which the patient's physical well-being would likely be put in jeopardy or serious physical impairment or dysfunction would result.*" (Emphasis added.) Id., 233; see also *Yale-New Haven Hospital* v. *Dept. of Social Services,* Superior Court, judicial district of New Britain, Docket No. 049558S (July 31, 2000) (27 Conn. L. Rptr. 653, 655) (stating that "emergency" under medicaid means medical emergency).

In the present case, the plaintiff, at the time he was admitted to the hospital, suffered from symptoms that required immediate medical treatment, without which his physical well-being certainly was placed in jeopardy. The only evidence regarding the plaintiff's disease was the letter written by Erichson that described acute myelogenous leukemia as "a rapidly fatal disease" and that "in the absence of such therapy," the plaintiff would have, in all likelihood, died.[8] The plaintiff's condition

---

[8] "In any event, the medical condition of a client in a medicaid or medicare case is determined by the medical judgment of the medical doctor, not by administrative fiat." *Gaddam* v. *Rowe,* 44 Conn. Sup. 268, 271, 684 A.2d 286 (1995). In *Gaddam,* the Superior Court held that an alien entitled to medicaid payment for treatment does not lose that entitlement when the acute symptoms that precipitated the treatment dissipate, even though the symptoms will reoccur rapidly and death will result in less than two weeks if that treatment is halted. Id.

on November 24, 1998, when he was admitted to the hospital and was diagnosed with acute myelogenous leukemia, was no different from the patients in *Greenery Rehabilitation Group, Inc.*, at the time they suffered head injuries resulting from a motor vehicle accident, a gunshot wound and physical assault that necessitated immediate treatment prior to their arrival at the Greenery Rehabilitation Center. The plaintiff received aggressive treatment over the course of the next month[9] and was discharged on December 26, 1998. Thus, it is readily apparent that the type of care that he received was distinguishable from the long-term, daily regimented care that the patients in *Greenery Rehabilitation Group, Inc.*, required.

Moreover, the hearing officer in the present case found that the plaintiff would not have immediately died on November 24, 1998, if he had not received treatment, that the treatment received by the plaintiff was not an emergency event and that there was no indication that the plaintiff's health would have been in serious jeopardy if treatment was not commenced on November 24, 1998. Essentially, the test used by the hearing officer, subsequently endorsed and validated by the trial court and by the majority, required the plaintiff to show that he would have died if treatment of acute myelogenous leukemia did not start on November 24, 1998. The test seemingly injects a "trauma" requirement into the standard established by the Second Circuit in *Greenery Rehabilitation Group, Inc.*

I believe, therefore, that the majority has read the applicable federal law and *Greenery Rehabilitation Group, Inc.*, in too narrow a fashion and introduced an additional element. The hearing officer and the trial court placed great emphasis on the factual finding that

---

[9] The plaintiff's claim is limited to the initial hospitalization that was required to stabilize his condition, not any subsequent treatment.

the plaintiff would not have immediately died on November 24, 1998, if he did not receive treatment. As set forth in 42 U.S.C. § 1396b (v) (3), an emergency medical condition does not have an immediate death requirement. Instead, the plaintiff must show a condition, manifested by acute symptoms of sufficient severity, and that the absence of immediate medical attention *could reasonably be expected to result* in placing the patient's health in danger, serious impairment to bodily function or serious dysfunction of any organ or body part.[10] The plaintiff demonstrated symptoms on November 24, 1998, that included intense pain, nausea and overall weakness. Although the plaintiff in the present case may not have died on November 24, 1998, without receiving treatment, it is clear from the evidence that he suffered from a rapidly fatal disease that required an aggressive protocol of treatment that included chemotherapy and surgery, and that the absence of such treatment would have placed his health in danger and, in all likelihood, resulted in death. The letter written by Erichson established the severity of acute myelogenous leukemia, as well as the temporality and urgency of commencing treatment as soon as possible to prevent placing the plaintiff's health in further jeopardy. Such treatment was necessary to stabilize the acute condition of the plaintiff as of November 24, 1998. Furthermore, the treatment consisted of approximately one month of hospitalization, which is readily distinguishable from the chronic, and perhaps permanent, treatment required by the patients in *Greenery Rehabilitation Group, Inc.*[11]

---

[10] One commentator has stated that the "treatment does not necessarily need to occur immediately after the onset of the illness or injury in order to be covered under emergency Medicaid." J. Costich, "Legislating a Public Health Nightmare: The Anti-immigrant Provisions of the 'Contract with America' Congress," 90 Ky. L.J. 1043, 1052 (2002).

[11] The facts of the present case are likewise distinguishable from a case cited by the defendant. In *Quiceno* v. *Dept. of Social Services*, 45 Conn. Sup. 580, 728 A.2d 553 (1999), the patient suffered from end stage renal failure due to systemic lupus erythematosus. As a result, she required ongoing kidney dialysis on a permanent basis. Id., 581.

In summary, the plaintiff, on November 24, 1998, was admitted to the hospital with an illness that was characterized by the onset of sudden and severe symptoms. His condition required immediate medical attention to prevent further harm. After approximately one month of treatment, the short-lived illness was stabilized. Accordingly, the plaintiff's condition met the definition of an emergency medical condition as set forth by the Second Circuit in *Greenery Rehabilitation Group, Inc.*

I conclude, therefore, that the hearing officer used an improper standard, that the plaintiff suffered from an emergency medical condition as defined by federal law and that the department was required, due to this state's participation in medicaid, to provide benefits to the plaintiff.

## II

I also would hold that the defendant, according to the language in the state regulations, has elected to provide additional benefits to unlawful aliens and that the plaintiff is entitled to benefits under the state regulations, independent of the federal statute.

It is well established that a state may accord its citizens additional protection and benefits beyond those provided by the federal government. Our Supreme Court, in the context of interpreting our state constitution, has frequently stated that "[w]e have also, however, determined in some instances that the protections afforded to the citizens of this state by our constitution go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court." (Internal quotation marks omitted.) *State* v. *Brocuglio*, 64 Conn. App. 93, 101, 779 A.2d 793, cert. granted on other grounds, 258 Conn. 908, 782 A.2d 1247 (2001); see also *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992). In *Cotto* v. *United Technologies Corp.*, 48 Conn. App. 618, 711 A.2d 1180 (1998),

aff'd, 251 Conn. 1, 738 A.2d 623 (1999), we stated that "[a] state may adopt, in its own constitution, individual liberties more expansive than those conferred by the federal constitution and a state statute [or regulation] is, for that purpose, in the same category as a state constitution." Id., 626.

I also note the difference that exists between interpreting federal statutes and regulations as opposed to state statutes and regulations. For example, in *Greenery Rehabilitation Group, Inc.*, the Second Circuit stated: "In interpreting a statute, we must first look to the language of the statute itself. . . . [U]nless otherwise defined, individual statutory words are assumed to carry their ordinary, contemporary, common meaning. . . . If the statutory terms are unambiguous, our review generally ends and the statute is construed according to the plain meaning of its words. . . . Only where doubt or ambiguity resides in a Congressional enactment . . . may legislative history and other tools of interpretation beyond a plain reading of the statute's words be used." (Citations omitted; internal quotation marks omitted.) *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 150 F.3d 231; see also *Freier* v. *Westinghouse Electric Corp.*, 303 F.3d 176, 197 (2d Cir. 2002).

Until recently, the courts of this state also used the plain meaning method of statutory interpretation. Our Supreme Court, however, recently eschewed the plain meaning approach in *State* v. *Courchesne*, 262 Conn. 537, 816 A.2d 562 (2003) (en banc). "In summary, we now restate the process by which we interpret statutes as follows: The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In

seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Thus, this process requires us to consider all relevant sources of the meaning of the language at issue, without having to cross any threshold or thresholds of ambiguity. Thus, we do not follow the plain meaning rule.

"In performing this task, we begin with a searching examination of the language of the statute, because that is the most important factor to be considered. In doing so, we attempt to determine its range of plausible meanings and, if possible, narrow that range to those that appear most plausible. We do not, however, end with the language. We recognize, further, that the purpose or purposes of the legislation, and the context of the language, broadly understood, are directly relevant to the meaning of the language of the statute.

"This does not mean, however, that we will not, in a given case, follow what may be regarded as the plain meaning of the language, namely, the meaning that, when the language is considered without reference to any extratextual sources of its meaning, appears to be *the* meaning and that appears to preclude any other likely meaning. In such a case, the more strongly the bare text supports such a meaning, the more persuasive the extratextual sources of meaning will have to be in order to yield a different meaning." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 577–78.

In the present case, federal law merely sets the floor below which the state is prohibited from denying benefits, but the state, through its regulations, may provide

additional benefits. See, e.g., *Mercy Healthcare Arizona, Inc.* v. *Arizona Health Care Cost Containment System,* 181 Ariz. 95, 97, 887 P.2d 625 (App. 1994) ("[i]f a state chooses to extend treatment to other groups, the state assumes the cost of health care for those . . . individuals"); *Crespin* v. *Kizer,* 226 Cal. App. 3d 498, 504, 276 Cal. Rptr. 571 (1990). In *Dominguez* v. *Superior Court,* 226 Cal. App. 3d 524, 276 Cal. Rptr. 564 (1990), the California Court of Appeal addressed the issue of whether a state statute provided more benefits to undocumented aliens than did the federal counterpart.[12] "States are . . . free to provide additional medical coverage without federal financial participation." Id., 528. The court also noted that "[i]t is undisputed that the [state] may authorize broader health care services than those authorized by federal law." Id., 531 n.7. The court concluded that while the plaintiff could not receive benefits under federal law, he was eligible under state law.

The majority, on several occasions, posits that the state regulation mirrors its federal counterpart. I cannot agree. The language of 42 U.S.C. § 1396b (v) (3) is not duplicated and reproduced in the corresponding state regulation. Section 3000.01 provides that "[a] medical condition is considered an emergency when it is of such severity that the absence of immediate medical attention could result in placing the patient's health in

---

[12] In *Dominguez,* the petitioner, an undocumented alien, developed acute symptoms of leukemia. *Dominguez* v. *Superior Court,* supra, 226 Cal. App. 3d 526. California paid for forty days of hospitalization for chemotherapy treatment. Id. The plaintiff then sought to obtain payment from the state for a bone marrow transplant. Id., 527. The issue before the court concerned the bone marrow transplant, not the initial, stabilizing treatment of chemotherapy. Id. The court held that although the bone marrow transplant was not an emergency medical condition, it was covered under the "continuation of medically necessary inpatient hospital services and follow-up care" provision of the applicable statute that was added by the California legislature. Id., 533.

serious jeopardy. This includes emergency labor and delivery, and emergencies related to pregnancy, but does not include care or services related to an organ transplant procedure." Department of Social Services, Uniform Policy Manual § 3000.01. Thus, a comparison of the two provisions reveals that the phrase "acute symptoms of sufficient severity" that is present in the federal law is absent from the state counterpart. Section 3000.01, by its language, defines an emergency medical condition as one with "such severity that the absence of immediate medical attention could result in placing the patient's health in serious jeopardy. . . ." Id. It is a tenet of statutory construction that "[w]ords in a statute must be given their plain and ordinary meaning . . . unless the context indicates that a different meaning was intended. . . . Where a statute does not define a term it is appropriate to look to the common understanding expressed in the law and in dictionaries." (Citation omitted; internal quotation marks omitted.) *State* v. *Vickers*, 260 Conn. 219, 224, 796 A.2d 502 (2002). On the basis of the text of § 3000.01, the regulation itself defines what, under that regulation, constitutes an emergency medical condition and obviates the need to look for the " 'common understanding' "; id.; as was done by the Second Circuit in *Greenery Rehabilitation Group, Inc.*

I also point out that General Statutes § 17b-260, which authorized the defendant to participate in the medicaid program, states that it "*may* administer the same [medical assistance programs] in accordance with the requirements provided therein . . . ." (Emphasis added.) Our legislature did not mandate that the defendant follow the requirements as set forth by the federal government. "We have consistently held that may is directory rather than mandatory. . . . The word may, unless the context in which it is employed requires otherwise, ordinarily does not connote a command.

Rather, the word generally imports permissive conduct and the conferral of discretion." (Citation omitted; internal quotation marks omitted.) *Waterbury* v. *Washington*, 260 Conn. 506, 531, 800 A.2d 1102 (2002). Thus, it is clear that the defendant is not required simply to follow the federal government's lead, but has the discretion to provide additional benefits if it so chooses.

Finally, and most notably, the department, unlike some of our sister states that participate in medicaid, did not adopt the exact text of the federal statute or regulation. See, e.g., Ill. Admin. Code tit. 89, § 120.310; N.J. Admin. Code tit. 30, § 4D-6f; N.M. Admin. Code tit. 8, § 3.2.1.12; N.Y. Comp. Codes. R. & Regs. tit. 18, § 360-3.2. On the basis of all of the foregoing, I conclude that this state elected to provide coverage in excess of that required by the federal government. We must, therefore, independently interpret § 3000.01 as a matter of state law and, as a result, the opinion in *Greenery Rehabilitation Group, Inc.*, while persuasive and instructive authority, is not binding on this court.

In the present case, it is clear that the plaintiff suffered from a severe medical condition, acute myelogenous leukemia. Furthermore, in the absence of immediate medical treatment on November 24, 1998, the plaintiff's health could have, and probably would have, been placed in serious jeopardy. As Erichson's letter stated, this type of cancer is characterized as a "rapidly fatal disease unless treated aggressively with chemotherapy." Section 3000.01 does not have a requirement that the plaintiff would have died that day if treatment had not started on the date of his admission to the hospital; it requires only that his health *could be placed in serious danger*. Furthermore, there was credible evidence in the record that absent treatment, the plaintiff would, in all likelihood, have died by June 7, 1999. The plaintiff needed that treatment to survive. Thus, the plaintiff suffered from a condition that, in the

absence of immediate medical attention, caused his health, and in fact his life, to be placed in jeopardy. His condition, therefore, met the definition of emergency medical care set forth by § 3000.01.

I conclude, therefore, that under either the federal statutory scheme or the state regulation, the plaintiff was entitled to receive benefits because he suffered from an emergency medical condition and that it was improper for the court to deny his appeal. Accordingly, I respectfully dissent.